[Civ. No. 23731. Second Dist., Div. Two. Jan. 28, 1960.]

THE PEOPLE, Respondent, v. PARAMOUNT CITRUS ASSOCIATION, INC. (a Corporation), Appellant.

506

G. V. Weikert for Appellant.

Stanley Mosk, Attorney General, and Alberta Gattone, Deputy Attorney General, for Respondent.

HERNDON, J.—This is the second appeal in this action. In *People* v. *Paramount Citrus Assn.*, 147 Cal.App.2d 399 [305 P.2d 135], Division One of this court in part affirmed, and in part reversed with directions, the original judgment of the trial court. The facts and the issues of law as developed at the first trial are fully set forth in that opinion.

The defendant Paramount Citrus Association, appellant on the former appeal, now appeals from the judgment which was entered following the proceedings on remand. Appellant's major contention on the instant appeal is that in rendering the present judgment the trial court did not faithfully follow the directions of the appellate court and failed properly to apply the law of the case as declared in the opinion by which the former appeal was decided. We have concluded that this contention is not well taken.

This action was prosecuted by the attorney general upon the complaint of the Director of Agriculture (hereinafter re-

ferred to as the "Director") seeking civil penalties and injunctive relief under Agricultural Code, section 1300.19. Pursuant to Agricultural Code, section 1300.10 et seq., the Director issued a marketing order, effective October 1, 1954, and amended from time to time thereafter, requiring processors of lemon products to place a specified percentage of all their lemons received for processing during the 1954-1955 marketing season in a "Stabilization Pool" subject to the control of the Director and the Lemon Products Advisory Board (hereinafter referred to as the "Board"), which was appointed by the Director pursuant to the authority granted him by section 1300.15 of the Agricultural Code. The rules and regulations issued pursuant to the marketing order provided that all products delivered to the Board in fulfillment of a processor's obligations to the Stabilization Pool should be certified by the United States Department of Agriculture as having been processed in California, and that all bulk containers should be sealed by that department. Appellant is a processor of lemons.

At the original trial, it was established that appellant, in accordance with the terms of the marketing order and regulations, had reported to the Board all lemons acquired by it for processing, but as to 34 separate weeks did not deposit the required percentage of said lemons with or hold them for the Stabilization Pool, nor did it execute any agreement for postponed compliance or post any bond or cash with the Board. Certain barrels of lemon concentrate were later delivered but were rejected by the Board as not having been certified or sealed by the United States Department of Agriculture. On June 27, 1955, appellant delivered 81 barrels of lemon concentrate which were certified and sealed by the United States Department of Agriculture and accepted by the Board, but which were not credited against appellant's delinquency. It is to be noted, however, that these 81 barrels were not delivered until two days after the close of the last of the 34 weeks for which plaintiff sought to have penalties imposed. The Board's manager testified that the 81 barrels of concentrate were the approximate equivalent of 250 tons of fruit. (It was later stipulated that the exact equivalent was 253.47 standard fruit tons.)

At the conclusion of the original trial, the trial court found: that appellant's violations were willful; that the total amount of the delinquency amounted to 1,701.14 standard tons; that appellant had delivered, and the Board had accepted, 81 bar-

rels of lemon concentrate, but that appellant had not furnished to the Board a laboratory analysis showing the citric acid content of said 81 barrels; and that appellant would be entitled to a credit against its obligation as soon as such analysis was furnished. The court further found that appellant would continue to violate the marketing order, rules and regulations unless enjoined. By its conclusions of law, the court concluded that plaintiff was entitled to recover the maximum penalty of $500 for each of the 34 weekly violations, or a total of $17,000, and gave judgment for plaintiff for civil penalties in that sum. The court further issued an injunction ordering appellant to deliver past delinquencies to the Board, as well as to comply in the future with the marketing order and any valid amendments thereto. Finally, the trial court enjoined appellant from processing lemons unless and until it rectified past delinquencies and complied in the future with the marketing order.

Appellant raised numerous points on the first appeal of this case. In answer to its first contention that it did not have a fair trial, Division One of this court held that appellant did not sustain its burden of demonstrating unfairness. The further contention that there was no evidence to support the trial court's finding that appellant's violations of the marketing order were willful and deliberate was rejected with a holding that "[t]he trial court was . . . fully justified in finding that appellant's violations of the marketing order were willful and deliberate."

However, the portion of the judgment assessing penalties of $17,000 was reversed, the court stating (at pages 410-411): "The evidence shows without conflict that on *June 27, 1955,* appellant delivered, and the board accepted, for compliance with appellant's Stabilization Pool obligation, 81 barrels of lemon concentrate; yet the board, while accepting this 81 barrels as delivered in partial fulfillment of appellant's obligation, gave appellant no credit therefor and the trial court in assessing penalties, allowed no credit therefor. This was done seemingly upon the basis that appellant had not furnished a laboratory analysis showing the citric acid content of the concentrate in the barrels. In our opinion, however, the plaintiff was obligated, as a part of its case and in support of its claim for penalties, to prove the weeks as to which appellant was delinquent in fulfilling its obligations to the Pool. The evidence having shown without conflict that appellant had delivered and the board had accepted 81 barrels of concentrate, it was incumbent upon the plaintiff to prove to what extent

if any appellant remained in default under its obligations to the Pool. The record is not devoid of evidence from which this fact could be ascertained, for the manager of the advisory board testified that the concentrate delivered would be the equivalent of approximately 250 tons of fruit. This concentrate having been accepted as partial compliance by appellant with its obligation, it follows that *if* it satisfied appellant's obligation for one or more full weeks, no penalty could be exacted for those weeks. An examination of Plaintiff's Exhibit 7 demonstrates that *if* this 250 tons of fruit had been applied to appellant's obligations during the first part of the marketing season, it would have satisfied its obligation for at least the first four weeks; or *if* credited upon appellant's obligation at the latter part of the period for which penalties were sought, it would have satisfied at least the last six weeks on account of which appellant has been assessed penalties.

*"It was the duty of the trial court to make some proper allocation* of the 81 barrels of concentrate which admittedly were accepted by the board in fulfillment of appellant's obligation, and *it could not assess penalties for weeks as to which appellant's default in its obligations was rectified by the concentrate delivered."* (Emphasis supplied.)

With further regard to the civil penalties, the court stated (at pages 413-414): "Paragraph II of the judgment made and entered by the trial court by which plaintiff is awarded judgment against appellant in the sum of $17,000 as civil penalties is reversed, *with directions to the trial court to receive such further competent evidence as the parties may offer relative to the citric acid content of the 81 barrels of cencentrate delivered to and accepted by the Lemon Products Advisory Board on June 27, 1955, and to make such allocations thereof to the delinquencies for which penalties are sought as the court shall find proper, and thereafter to enter judgment awarding plaintiff penalties, in such sum as the court may find just, against the appellant as to the delinquency for each week which is not fully satisfied by such allocation, not to exceed $500 for each violation."* (Emphasis supplied.)

In addition, Division One held that the mandatory injunction, ordering appellant to forthwith deliver its total delinquencies and enjoining it from engaging in business as a processor until it had rectified past delinquencies, could

not be sustained. The court stated that the trial court's powers were limited by the relevant provisions of the Agricultural Code to enjoin *further violations* and to condition appellant's continuance in business upon future compliance with the marketing order.

A petition for rehearing was denied on January 25, 1957. Respondent's petition for a hearing by the Supreme Court was denied on February 27, 1957.

After the case was remanded, appellant presented to Judge Clyde C. Triplett, then presiding in the master calendar department of the trial court, a motion to disqualify Judge Joseph W. Vickers, the original trial judge, from hearing any further proceedings in the case, supported by an affidavit to the effect that he was believed to be prejudiced against appellant and its attorney. This motion, which was filed in accordance with Code of Civil Procedure, section 170.6,[1] was denied solely on the ground that said section was "not applicable."

A hearing was then held on respondent's "Motion for Modification of Judgment in Accordance with Determination on Appeal," before Judge Vickers, at which hearing additional testimony was taken and exhibits were introduced. It was stipulated that the 81 barrels of lemon concentrate delivered by appellant to the Stabilization Pool on June 27, 1955, was equivalent to 253.74 standard fruit tons of lemons. An official charged with maintaining the books and records of the Board testified that he had made the credit of the 81 barrels of lemon concentrate accepted by the Board from appellant. It was indicated that the method which the Board followed was to apply the 81 barrels first to offset the delinquency incurred in the week in which they were delivered (the week of June 27, 1955) and then to prorate the remainder and allocate it in an equal percentage over each prior week in which a delinquency existed. Since it appeared from the testimony that this allocation method had resulted from *ad hoc* accounting procedures developed to meet the unique situation presented by this case and was therefore not in the category of standard administrative procedure, Judge Vickers ruled that evidence as to the Board's accounting procedures was irrelevant and immaterial. It further appeared that the marketing order involved in the case at bar was formally

[1]Section 170.6 of the Code of Civil Procedure, as enacted in 1957, is set forth in full in the appendix to *Johnson* v. *Superior Court*, 50 Cal.2d 693, 701 [329 P.2d 5]. The section was amended in 1959 to apply to criminal as well as civil cases.

terminated by the Director of Agriculture by an order effective September 30, 1957, and that at the time of the hearing on remand there were no regulations of the type here involved governing the lemon products industry.

By its findings of fact and conclusion of law the trial court approved the *pro rata* allocation method used by the Lemon Products Advisory Board; found that appellant remained in default for a total of 34 weeks (although the delinquency for each of said weeks was reduced by 11.4 per cent), and concluded that, since appellant's violations of the marketing order were willful, the maximum penalty of $500 per violation remained proper. Judgment was given for respondent in the amount of $17,000 total civil penalties, and in addition, appellant was permanently enjoined from processing lemons until and unless it fulfilled its Stabilization Pool requirements.

On this appeal from the judgment, appellant makes the following assignments of error: (1) "[i]t was error to deny appellant's motion to disqualify the trial judge"; (2) "[i]t was error to prorate the 81 barrels of concentrate in question over the entire season instead of applying it to specific weekly obligations otherwise unsatisfied"; and (3) "[i]t was error to enjoin appellant from violating a Marketing Order which was no longer in existence." We conclude that none of these contentions is well taken.

As we have noted, appellant's motion to disqualify the judge who presided at the original trial was made after the cause had been remanded to the trial court with directions that additional evidence be taken with relation to certain specified matters. The question is thus presented whether section 170.6 of the Code of Civil Procedure was properly invoked under these circumstances. We conclude that the court below was correct in holding the statute inapplicable.

With respect to this initial issue, the instant case is governed by the recent decision in *Jacobs* v. *Superior Court,* 53 Cal.2d 187 [347 P.2d 9], which dealt with the timeliness of a motion under section 170.6 made in connection with proceedings to modify the child custody provisions of a judgment. After referring to the provision of the statute that in no event shall a judge entertain a motion under this section if it is made after swearing in the first witness or the giving of any evidence or after the trial of the cause has otherwise commenced, the Supreme Court in an opinion by the Chief Justice declared: "Although the statute does not expressly

so provide, it follows that, since the motion must be made before the trial has commenced, it cannot be entertained as to subsequent hearings which are a part or a continuation of the original proceedings. . . . In situations involving guardianship and custody orders subsequent proceedings to obtain changes in custody are continuations of the original proceeding to determine custody.''

The further proceedings in the case at bar which were required by the appellate court mandate amounted to nothing more nor less than a resumption and a continuation of the trial of the action. This is so because the directions of the appellate court necessarily contemplated that the new judgment to be entered after the further proceedings in the trial court would be based upon the evidence taken at the original trial as supplemented by the additional evidence required to be taken. Hence, as a practical matter, the only alternative to a continuation of the trial before the same judge would have been a trial de novo, for it is a well-settled principle that in the absence of consent or waiver, one judge cannot make findings or enter a judgment upon evidence taken before another judge. (*Hughes* v. *DeMund,* 96 Cal.App. 365, 368 [274 P. 405]; *McAllen* v. *Souza,* 24 Cal.App.2d 247, 251 [74 P.2d 853]; *Bartholomae Oil Corp.* v. *Superior Court,* 18 Cal.2d 726, 728 [117 P.2d 674]; *Perez* v. *Perez,* 111 Cal.App. 2d 827, 829 [245 P.2d 344].) It is not reasonable to suppose, therefore, that the Legislature intended section 170.6 to be applicable in such circumstances as these. As stated in *Jacobs* v. *Superior Court, supra*: ''If a disqualification were permitted under section 170.6 in matters which are continuations of a prior proceeding, it would mean that the judge who tried the case, and who is ordinarily in the best position to pass upon the questions involved, could by a mere general allegation of prejudice, and without any judicial determination of the facts, be disqualified from hearing such matters as motions for modification of a support order or an injunction, as well as motions for change of custody of children. Such procedure would make it possible for litigants to gamble on obtaining a favorable decision from one judge, and then, if confronted with an adverse judgment, allow them to disqualify him without presenting facts showing prejudice, in the hope of securing a different ruling from another judge in supplementary proceedings involving substantially the same issues.''

 The major question presented by this appeal is whether or not the trial court's method of crediting the 81

barrels of lemon concentrate against appellant's delinquent Stabilization Pool obligations was reasonable and consistent with the law of the case as declared on the former appeal. This question must be answered in the affirmative. In the light of the purposes underlying chapter 10 of the Agricultural Code and the regulations and marketing orders promulgated thereunder, and in view of the willful nature of defendant's delinquencies in the instant case, the method of allocation adopted by the trial court may not fairly be characterized as either unjust or unreasonable.

Both appellant and respondent make numerous contentions regarding the directions given in the opinion on the former appeal. Appellant contends that said opinion explicitly directed the trial court to credit the concentrate in question against appellant's delinquencies on a week by week basis. Respondent, on the other hand, submits that any language in the opinion suggesting methods by which the credit might be applied should be regarded as merely discursive, suggestive, or illustrative, and that the only *directive* language in the remanding order is that which requires the trial court to make some "proper" allocation and to award penalties "in such sum as the court may find just . . . for each week which is not fully satisfied by such allocation."

We conclude that the language of the former opinion relied on by the appellant was illustrative only and that it did not direct the trial court to follow any specific accounting method. The remanding order directed the trial court to "receive such further competent evidence as the parties may offer relative to the citric acid content of the 81 barrels of concentrate delivered to and accepted by the Lemon Products Advisory Board on June 27, 1955, and to make such allocation thereof to the delinquencies for which penalties are sought *as the court shall find proper,* and thereafter to enter judgment awarding plaintiff penalties, *in such sum as the court may find just,* against the appellant *as to the delinquency for each week which is not fully satisfied by such allocation . . .*" (147 Cal. App.2d 399, at pages 413-414; emphasis supplied.)

Since no specific method of allocation was prescribed, it is evident that any "proper" and "just" method of crediting the 81 barrels in question carried out the appellate court directive. The trial judge evidently made his determination of the "proper" accounting procedure after a careful consideration of the purposes of the statutes, regulations and orders, as discussed in the opinion on the prior appeal. It is quite clear

that the purpose underlying legislation of the type here in question is to stabilize the prices of the commodity involved by regulating the amount of it to be offered on the market. (See Agr. Code, § 1300.10.) From this it follows that once a producer has violated such regulations, the harm which the Legislature sought to prevent has been done and no reparation tendered at a later date can rectify the wrong done.

This principle was clearly recognized on the prior appeal in this case in the reversal of the mandatory injunction provisions of the first judgment. Noting that the judgment was entered just as the marketing season was drawing to a close, the court stated (at p. 411) : ''[T]here is no evidence whatsoever which would justify a finding or conclusion that the deposit of appellant's delinquent tonnage into the Stabilization Pool would have any effect to stabilize the market price of lemons or lemon products for that marketing year, or to rectify any detriment caused by appellant's wrongdoing . . .'' And further, at page 413, the court stated: ''[T]he wrongs which the court by its mandatory injunction sought to right were not continuing ones but completed ones . . .''

From these statements, the trial court, in its memorandum of decision, properly reasoned that: ''If the wrongs were *completed* . . . completion must have taken place at the end of each week during which the defendant failed to comply with the order. Once completed, the liability for the penalty attached. Again, if the deposit of the total amount delinquent on August 11, 1955, would not have *rectified* any detriment caused by defendant's wrongdoing it is hard to understand how the deposit on June 27, 1955, of 11 per cent thereof would have *rectified* the default of the defendant for any one or more weeks or have rectified any prior non-compliance or violation of the order.''

The trial court's memorandum further states : ''I find nothing in the Agricultural Code, particularly in Chapter 10 thereof, which indicates that a delivery made after the time required constitutes a compliance with the Act. . . . [I]t cannot be fairly contended that such a delivery would make a processor of lemons, such as the defendant, not guilty of having violated its provisions any more than the return by the thief of the property stolen long after the theft would make him not guilty of the theft. . . . A contrary construction would also do violence to the primary purpose of the Act and the Director of Agriculture's orders and rules and regulations. This purpose was to stabilize market conditions by

equalizing the burden of surplus production so as to enable all producers of lemons to equally obtain a price sufficient to return to them their cost of production and a reasonable return for their labor. Clearly this was a continuing purpose throughout the marketing year in question . . . and would tend to be defeated each week that any processor . . . failed to comply therewith. In our own case the delivery of the 81 barrels in question on June 27, 1955, could not have affected the market price of lemons during the various weeks commencing with the one ending October 9, 1954, except possibly shortly before June 25, 1955, or have undone the wrong perpetrated by the defendant upon the other processors and producers of lemons who had all complied with the marketing order and the rules and regulations. Neither could it offset the profits the defendant made by wrongfully selling the lemons it was holding in trust for the board.''

On the basis of this eminently logical reasoning, the trial court adopted an accounting procedure whereby appellant received full credit for its delinquency incurred in the week in which the 81 barrels were delivered to the Board. The remainder of the 81 barrels could not reasonably have been allocated to any specific weeks in which delinquencies had previously occurred since, as to these weeks, the wrongs were completed and later delivery of lemon concentrate could not have rectified the harm done. Therefore, the trial court properly applied the balance to the total delinquency and reduced each delinquency pro rata. Because appellant's defaults were willful, it was proper to reassess the civil penalties at the maximum figure of $500 for each such violation.

In addition to the fact that this solution is a sensible one from the viewpoint of the purposes of the legislation, it is not unjust to appellant in the light of all the facts and circumstances relating to the preparation, delivery and acceptance of the 81 barrels of concentrate. Among the circumstances reasonably pertinent were those tending to show that there was no effective tender of these barrels prior to June 27, 1955, because their earlier rejection by the Board was chargeable to appellant's failure to comply with the regulation relating to certification and sealing by the federal Department of Agriculture and not to the imposition of unreasonable conditions by the Board. The trial court thoroughly canvassed this subject of inquiry on the first trial and concluded that the fault lay with appellant. The decision on the former appeal implicitly sustained the trial court's ruling

in this regard. In its findings of fact on the remand, the trial court again found that no valid or effective tender or delivery was made prior to June 27, 1955, and our review of the record has satisfied us that this finding is sustained by substantial evidence.

 The injunctive features of the original judgment (entered on August 11, 1955) were reversed in part and modified and affirmed in part on the prior appeal in this case. (147 Cal.App.2d 399, 414-415.) As modified on the former appeal, these provisions were incorporated into the new judgment on the remand (entered on July 30, 1958). It appeared from the testimony that prior to the time of the proceedings on remand the marketing order under which this litigation originally arose had been terminated by an order of the Director of Agriculture. Appellant therefore requests this court to vacate the permanent injunction on the ground that since ''[t]he injunction speaks from the time of the entry of the judgment,'' and since on July 30, 1958, there was no marketing order in effect, ''there was nothing that could be violated, and no reason for issuing an injunction of any kind.''

This request cannot be granted. The injunction speaks from the time of the entry of the judgment and since the injunctive features of the judgment here complained of were modified and affirmed on the prior appeal, they relate back to and become final as of the date of entry of the original judgment, August 11, 1955. There is no claim that the marketing order was not in effect on that date. No issues concerning injunctive relief were remanded for the consideration of the trial court and therefore it could do nothing in this respect but give effect to the judgment as modified and affirmed. This it did by incorporating into the new judgment the exact language prescribed by Division One of this court.

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.