Douglas MOFFITT, Appellant,

v.

Marsha MOFFITT, Appellee.

No. S–1656.

Supreme Court of Alaska.

Jan. 15, 1988.

Lee Holen, Johnson and Holen, Anchorage, for appellant.

M. Ashley Dickerson, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Doug Moffitt appeals the property division made as part of his divorce from Marsha Moffitt, his wife and business partner. Following a three-day bench trial, Judge Taylor issued findings and conclusions generally dividing the business property equally, but awarding to Doug certain property that he had brought into the marriage (the Palmer property). Because both parties objected, these findings and conclusions were never finalized by a decree of divorce. Subsequently, Judge Taylor retired. After several hearings, Judge Carlson vacated Judge Taylor's findings and conclusions, substituted new findings and conclusions proposed by Marsha, and issued a final decree of divorce. Judge Carlson's decision divided the Palmer property equally, and awarded Marsha half the earnings of the business following the parties' separation.

We affirm Judge Carlson's findings and conclusions except as to the value placed on the good will of the business. We remand this case to the trial court for a finding on the value of the business good will that is based on a sound appraisal method.

## I. FACTS

Marsha and Doug Moffitt were married in 1974. At the time of the marriage, Doug owned Moffitt Contracting, a business which included a parcel of land in Palmer, some heavy equipment, a house, a shop and some outbuildings.

The business could barely pay its own expenses when Marsha moved in with Doug in 1972. Marsha began helping Doug with the business in 1973 by doing bookkeeping part-time. After they were married, Marsha quit her job and began working full-time in the business, driving trucks, running crushers, loading trucks, as well as handling the books. The business prospered. Marsha signed loans with Doug to buy equipment for the business and signed the deed of trust on the Palmer property, on which Doug owed $28,000.

Around 1979, Moffitt Contracting began doing business in the Bush. The parties acquired additional equipment for the business, plus real estate in Aniak and Red Devil. In the three years prior to trial, most of Moffitt Contracting's business was in the Aniak area.

In April 1984, the parties separated. Marsha remained at the family home in Palmer, while Doug established a home in Aniak. Although in the past Marsha had handled the business bookkeeping from Palmer when Doug worked in Aniak, Doug took steps after the separation to restrict Marsha's involvement with or knowledge of the business by changing bank accounts and mail delivery. Doug expressed unwillingness to cooperate with Marsha in the business operation following their separation. Doug continued to operate the business in Aniak, but did not provide a full accounting of his business activities to Marsha.

## II. PROCEEDINGS

Marsha served Doug with a complaint for divorce in April 1984. By stipulation,

the parties agreed to continue business operations without disposing of assets. They agreed to provide a full accounting.

In November 1984, Marsha charged Doug with contempt of court for removing funds from a joint or business account and for redirecting business mail from Palmer to Aniak in violation of a court order. Judge Carlson held Doug in contempt ordering Doug to return the money to the joint account, and Marsha to receive and pay the business bills. The issue then presented to the court was whether the business could continue to be operated by both partners until a buy out could be arranged. Judge Carlson again found Doug in contempt of court in March 1985 for failing to provide Marsha with bills needed in appraising the business.

Trial on the property division was set by Judge Carlson but held before Judge Taylor in April 1985. On August 5, Judge Taylor issued his findings and conclusions, to which both parties objected. Before a decree of divorce was entered on these findings and conclusions, Judge Taylor retired, and Judge Carlson resumed supervision of the case. Judge Carlson heard additional contempt proceedings in August 1985, September 1985 and February 1986.

In May 1986, Judge Carlson vacated Judge Taylor's findings and conclusions "in view of the fraud perpetrated on the court by the Defendant [Doug] and his concealment of assets ..." On the same day, he issued new findings and conclusions and a final decree of divorce.

Doug appeals from the property award made pursuant to the new findings and conclusions. He seeks reinstatement of Judge Taylor's findings and conclusions with two modifications relating to the value of business assets.

### III. DISCUSSION

#### A. Judge Carlson Was Authorized to Substitute New Findings and Conclusions for Those of Judge Taylor.

Doug contends that Alaska R.Civ.P. 63(c) prevents a successor judge from entering new findings and conclusions after the judge who heard the case has entered findings and conclusions. Doug also asserts that Judge Carlson's finding of fraud on the court was clearly erroneous. Therefore, Doug contends, Judge Carlson could not vacate the decision of Judge Taylor pursuant to Rule 60(b).

Marsha argues that because Judge Taylor's decision was not final, Judge Carlson could modify it. She also argues that Doug waived any objection to Judge Carlson's actions when both parties agreed to have Judge Carlson issue new Findings of Fact and Conclusions of Law. Finally, she argues that Judge Carlson did not err in finding that Doug's acts constituted fraud upon the court.

We must first determine if Doug waived his right to object to Judge Carlson's actions after he was reassigned this case and resumed judicial proceedings concerning the merits of the action. If a waiver occurred, then we need not address Doug's other arguments pertaining to Alaska R.Civ.P. 60(b) or 63(c).

A party can waive his right to object to a successor judge's exercise of authority. In *Townsend v. Gray Line Bus Co.*, 767 F.2d 11, 18 (1st Cir.1985), the court upheld the substitute judge's entry of judgment when the trial judge became disabled after trial but before entering findings and conclusions. The court held that while normally constitutional considerations would mandate a new trial, Gray Line waived this right when it failed to appear at a status conference called by the successor judge, failed to respond to opposing counsel's letter notifying Gray Line that the successor judge intended to proceed on the trial record, and failed to otherwise communicate with the court. *Id.* The court determined that Gray Line had "no right to sit back and await decision of the case before objecting to the procedure." *Id.* Accord *People v. Paramount Citrus Ass'n.*, 177 Cal.App.2d 505, 2 Cal.Rptr. 216 (1960); *Christopher v. Nelson*, 50 Mich.App. 710, 213 N.W.2d 867 (1973); *Phalen v. Rilley*, 154 Mont. 399, 465 P.2d 102, 104 (1970) (successor judge lacked power to make new findings absent consent of parties).

We adopt the rule set out in *Gray Line*. If a party acquiesces to the authority of a successor judge by failing to make a timely objection to that judge's authority, the party has waived any objection he or she may have to challenge that authority. Furthermore, we find that Doug did waive his objection.

Both Marsha and Doug objected to Judge Taylor's findings and conclusions. As a result, those findings and conclusions were not finalized in a decree of divorce. Although Doug asserted the right to operate the business awarded to him in Judge Taylor's decision, he did not make the required buy-out payments to Marsha. Instead, Doug participated in three hearings before Judge Carlson following trial without ever challenging Judge Carlson's authority, and submitted proposed findings and conclusions in response to Judge Carlson's direction that he respond to the findings and conclusions submitted by Marsha.

At one point in the February 21, 1986 hearing, Judge Carlson stated, "I don't want to have to go back and retry [the case]. All the money is being used up in attorney—or will be used up in attorney's fees." Both parties were present, with their attorneys, neither one objecting to the successor judge's inference that he would decide the case on the record before the initial judge. Thus both parties submitted to the successor judge's authority.

Procedural objections must be made in a timely manner before the successor judge enters a final decree of divorce. *See also* Alaska R.Civ.P. 42(c)(4)(i). As in the *Gray Line* case, Doug acquiesced in the successor judge's procedure by failing to make a timely objection.[1] We find that this record clearly establishes Doug's waiver of any objections to Judge Carlson's authority to enter new findings of fact and conclusions of law which differed from those initially entered but not finalized by Judge Taylor.

### B. Judge Carlson Did Not Abuse His Discretion in Dividing the Assets of the Marriage As He Did.

#### (1) Standard of Review

The standard of review applied by this court in property division cases is to determine whether the trial court abused the broad discretion given it under AS 25.-24.160(a)(4). The division of property by the trial court is a three-step process: Step one—determining what property is available for distribution—is reviewed under the abuse of discretion standard, although it may involve legal determinations to which this court applies its independent judgment. *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983). The second step—placing a value on the property—is a factual determination that will be upset only if there is clear error. Alaska R.Civ.P. 52(a). Step three—allocating the property equitably— is reviewed purely under the abuse of discretion standard and "will not be disturbed unless it is clearly unjust." *Wanberg*, 664 P.2d at 570.

#### (2) Palmer property

Doug argues that Judge Carlson erroneously treated the Palmer property as entirely a marital asset. Doug argues that Judge Taylor correctly held that 83.2% of the Palmer property was his separate, premarital property, and should be awarded to him. Judge Taylor apparently determined that 16.8% of the payments for the Palmer property was made from marital assets.[2] Therefore, he held that only 16.8% of the current value of the Palmer property was a marital asset.

The trial court may invade the separate, premarital property of one spouse when necessary to balance the equities between the parties, or when the parties treated such properties as joint holdings in which each took "an active interest in the ongoing maintenance, management and

---

1. Doug now suggests that he made no waiver, because Judge Carlson could have decided to enter Judge Taylor's findings. However, Judge Carlson made it clear that he had no intention of doing that.

2. Doug's attorney suggested this percentage, which he calculated by dividing the value of the Palmer property at the time of the marriage ($166,000) into the amount paid for it out of marital assets ($28,000).

control of [the] assets." *Wanberg,* 664 P.2d at 571; *see Rosson v. Rosson,* 635 P.2d 469, 471 (Alaska 1981) (spouses agreed to put everything in "one pot" and acted as one economic unit). In the latter circumstance, invasion of the premarital assets may be mandatory. *Wanberg,* 664 P.2d at 571.

■ Judge Carlson's decision to divide the entire Palmer property as a marital asset was not an abuse of his discretion because the parties treated the property as a joint holding in which each took a similar, active interest. *See Burgess v. Burgess,* 710 P.2d 417 (Alaska 1985); *Rosson,* 635 P.2d at 471. Both Doug and Marsha were named on the deed of trust note on the whole property. They lived on the property as their joint personal residence throughout the nine years of the marriage, excepting times when one or both were temporarily in Aniak. The Palmer property was part of the business; for example, all the house utilities were in the business name, and the property was the situs for the business's heavy equipment. We conclude that Marsha and Doug considered the property an asset of the business for which each had equal responsibility and equal rights.

### (3) Business Good Will

Both Judge Taylor and Judge Carlson found that Marsha was entitled to property to offset one-half the value of Moffitt Contracting (which was awarded to Doug), including the value of its good will. Both judges found that the value of the good will was one-third of the value of its assets, or about $200,000. Doug argues that this finding is clearly erroneous because it is entirely unsupported by the record. We agree.

■ A finding is clearly erroneous if it is unsupported by anything in the record. *Miller v. Miller,* 739 P.2d 163 (Alaska 1987). Marsha testified that she believed the business good will was worth $300,000. Doug's attorney suggested that the good will was worth $10,000. Judges Taylor and Carlson apparently chose a compromise figure somewhere between these two. This is not a valid method for valuing business good will for purposes of property division in a divorce proceeding.

■ Preliminarily, the trial court must decide whether good will exists. If the trial court finds good will exists, it then must determine whether the good will could actually be sold to a prospective buyer. If the trial court determines either that no good will exists or that the good will is unmarketable, then no value for good will should be considered in dividing the marital assets.[3] Conversely, the good will should be considered if the evidence suggests that it has value and is marketable. In that case, the trial court should use one or more principled methods of valuation.[4] In *Pat-*

---

**3.** We favor this approach because to award the value of an unmarketable asset to an ex-spouse might restrict the liberty of the spouse who possesses that asset. That spouse might want to leave the business, change careers, go into public service, return to school, or any number of other possibilities that would reduce one's income. However, that spouse will frequently be restricted from doing so because of large payments on a promissory note to the ex-spouse. The spouse possessing the good will asset, which might constitute a large portion of the value of the business, will not be able to sell the asset because it is unmarketable. Furthermore, he or she will not be able to obtain any relief from the terms of the note, because property awards are not modifiable. *Allen v. Allen,* 645 P.2d 774, 776 (Alaska 1982). Other jurisdictions have expressed the same concerns and arrived at the same conclusion. *See, e.g., Rogers v. Rogers,* 296 N.W.2d 849, 853 (Minn.1980) (value of par-

ty's services to company not to be included in setting the value of marital property); *Nastrom v. Nastrom,* 262 N.W.2d 487, 493 (N.D.1978) (courts cannot "place a value on [one party's] skills as an entrepreneur so as to distribute that value as property").

To the extent that our decision here is contradictory or inconsistent with our prior decision in *Rostel v. Rostel,* 622 P.2d 429, (Alaska 1981), that case is overruled.

**4.** One day before Judge Carlson issued his final decision in this case, Doug submitted an expert appraisal of the business good will as an appendix to his memorandum in opposition to the proposed findings and conclusions. That appraisal used the IRS method and determined that (as of December 31, 1985) Moffitt Contracting had zero value in good will.

This document was not admitted in evidence before Judge Carlson. No one testified to its

**348**

*tee v. Pattee,* 744 P.2d 658 (Alaska 1987), we observed that "capitalization of net profits" is one recognized method for appraising business good will. We cited *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 179 (1984), where the Washington court recognized five methods for valuing good will. These include: (1) capitalization of net profits (or straight capitalization); (2) capitalization of excess earnings; (3) the IRS method, which subtracts a reasonable rate of return and salary from average earnings; (4) the market value approach; and (5) the "buy/sell agreement method," based on an actual transaction. *Hall,* 692 P.2d at 179–80.

We reverse and remand for reconsideration of the good will issue because the trial court's findings are not supported by substantial evidence in the record.

### (4) Aniak Property

Doug argues that the values given to the Aniak property (which was awarded to him) were inflated by both judges because they used the appraised "completed" value of $193,000 plus the value of a shed on the lot. Doug believed they should have used the "as is" value of $163,000 without adding the shed value because he claimed the shed was included in the basic appraisal. He also claims error in Judge Carlson's finding that valued the lot without subtracting a $10,000 debt allegedly owed on it.

We must affirm the trial court's findings of fact unless they are clearly erroneous; that is, unless upon our reading of the whole record, we are definitely and firmly convinced that the court made a mistake. Alaska R.Civ.P. 52(a); *Sumner v. Fel–Air, Inc.,* 680 P.2d 1109 (Alaska 1984).

Doug did not provide documentary evidence of the $10,000 debt. The only evidence provided consisted of his oral testimony. Marsha testified that, though Doug claimed a $10,000 debt existed on the property, the creditor told her that the creditor's unrelated use of Moffitt Contracting equipment would have reduced that, perhaps to zero. To the extent that this issue depends on the credibility of the parties, Judge Carlson had ample opportunity to evaluate the parties' demeanor on this particular question. Accordingly, we affirm Judge Carlson's recommendation.

The appraisal does not include any value for the "large shed" it lists. However, Marsha apparently provided an appraisal for a shed or building on the lot valued at $22,296. The transcript discloses that Doug and Marsha disagreed over whether the $22,296 shed was included in the appraisal of the lot and house. It seems unlikely that a house appraiser would not separately note the value of an outbuilding worth over $20,000. We see no clear error in the addition of this shed to the appraisal value of the property.

Neither judge explained why he used the "completed" appraised value of $193,000 rather than the "as is" value of $166,000 in valuing the Aniak property. Apparently, the reason was that Doug's attorney adopted the higher value in his trial summation. He stated:

> At that time [a year before trial] the Aniak property, the land and the improvements was valued at $197,720 ... I would refer Your Honor to the appraisal done by—well, the only Aniak appraisal in evidence, and I'm sure that the court will find that that value was—that the land and improvements were appraised at $197[000].[5]

Moreover, the property was improved after the appraisal in several ways. First,

preparation, and no one had any opportunity to challenge it. Apparently, Judge Carlson completely ignored it. Judge Carlson heard extensive testimony in this case in several contempt hearings, and properly could have admitted the appraisal had it been offered.

The document should not be stricken from the record. Appellate Rule 210(a)(1) provides for "transcripts, exhibits and any documents from the court file" to be included in the record. Under Civil Rule 10(c), exhibits may be attached to pleadings and motions. Such exhibits then become "documents" in the court file for the purposes of Appellate Rule 210(a)(1). Accordingly, the appraisal was part of the court record on appeal.

Of course, because the appraisal was not in evidence and the appellee has had no opportunity to respond to it or challenge it, this court can give it no weight as fact.

5. The appraisal gave $197,720 as the completed "cost approach" value, and $193,000 as the "market data" and final value.

Doug built a shop on it valued at $44,000. He conceded at trial that, if the court rejected his theory that he and Marsha were "equitably divorced" as of April 1984,[6] then the value of the Aniak property should be increased by the value of this shop. Second, the house in Aniak was converted into a triplex, a change which would probably increase the value of the property. At the very least, it suggests that the house was finished between the time of the appraisal in 1984 and the final divorce decree in 1986. Also, it turns a disadvantage noted on the appraisal concerning the layout of the house ("no interior stairwells connecting the 3 levels and being overbuilt for the Aniak area") into an advantage.

Accordingly, we find no error in the determination that the Aniak property should be valued at its "completed" appraisal value.

### (5) Business Debits and Credits

■ Given the conflicting evidence in the record on business and personal expenditures and income from Doug during the years after the separation, and considering Doug's failure to provide adequate accounting, we are not firmly convinced that Judge Carlson made a mistake in his valuation or division of these assets and obligations.[7]

## IV. CONCLUSION

Judge Carlson's decision to value the good will of Moffitt Contracting at one-third the value of its assets is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion. Otherwise, the division of property made by Judge Carlson's decree of divorce is AFFIRMED.

---

6. He has abandoned this theory on appeal.

7. Doug suggests that Judge Carlson wrongly considered fault in dividing the marital assets. While AS 25.24.160(a)(4) clearly provides for division of marital property "without regard to which of the parties is in fault," we see no reason why Doug's unwillingness to account to Marsha for partnership business is not relevant to deciding disputed issues of fact relating to the business's credits and debits. Cf. Horton v. Hansen, 722 P.2d 211 (Alaska 1986) (partner/husband who wrongly dissolved partnership lost his right to return of capital contribution on winding up of business).