Natalie B. MANELICK, Appellant,

v.

Gregory A. MANELICK, Appellee.

No. S–9986.

Supreme Court of Alaska.

Nov. 22, 2002.

Peggy A. Roston, Law Office of Peggy A. Roston, Anchorage, for Appellant.

Maryann E. Foley, Law Office of Maryann E. Foley, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. INTRODUCTION

In this appeal of the superior court's property division, Natalie Manelick challenges the superior court's valuation of her medical practice. Because the superior court failed to make findings as to the marketability of the goodwill of that practice, we reverse the superior court's valuation of goodwill and, because the record demonstrates that the goodwill was not marketable, we hold that no value may be assigned to it. Because both parties agree, we hold that the superior court erred in failing to include a debt the parties owed on a piano in the property division order. Finally, we hold that the superior court did not err in assigning a marital car a value of zero.

## II. FACTS AND PROCEEDINGS

### A. Facts

On July 31, 1997 Natalie B. Manelick filed for divorce from her husband, Gregory A. Manelick. Natalie and Gregory were married on July 11, 1987, and have three children. Natalie and Gregory accumulated a substantial amount of property and debt, including Natalie's medical practice, Gregory's military pension, and property and related debt in Alaska and Pennsylvania.

Natalie started a private medical practice as an internist in 1989. Natalie provided her medical services out of both her Wasilla medical clinic and Palmer Valley Hospital, where she has hospital privileges. The value of the medical practice was hotly contested during the divorce proceedings.

Gregory was in the military from 1973 until 1992, when he retired under a "Voluntary Separation Incentive" annuity program.

Since Gregory earned part of this retirement during the marriage, the portion earned from July 11, 1987 until his retirement was marital property.

Natalie and Gregory acquired a house in Palmer, a truck and camper, a Land Rover, and a piano, all of which had outstanding debt. The parties had $258,000 left to pay on their home mortgage and $44,228 on a home improvement loan. They also owed $39,868 on the truck and camper and $56,000 on the Land Rover. In addition, the parties owed the Internal Revenue Service $1,971.57. The piano is not recorded on the listing of marital properties but $7,000 is owed on it, even though it is apparently worth only $3,000. The marital estate also includes an 8.82 acre parcel in Palmer, three horses, personal property, three large parcels of property in Pennsylvania, and a retirement account, none of which carries any debt and the division of which is not at issue on appeal.

### B. Proceedings

Trial was held August 30–September 1, 1999 before Superior Court Judge Rene J. Gonzalez. The parties put their agreement as to child support, custody and visitation on the record on August 30, 1999 and the superior court accepted this agreement as in the best interests of the children. The parties stipulated to a partial decree of divorce on December 10, 1999, dissolving the marriage.

Both Natalie and Gregory submitted reports and presented expert testimony as to the value of Natalie's medical practice. Jacquelyn M. Briskey, a certified public accountant, served as an expert witness for Natalie in valuing her medical practice. Briskey opined that the fair market value of the practice as of December 31, 1998 was $156,497. Briskey's opinion was based on two methods of valuation: the capitalization of excess earnings method and a market approach method. The capitalization of excess earnings method is a method used to value intangible assets, such as goodwill. It is done by taking adjusted net income, as shown by tax returns, and subtracting an average rate of return on net assets (total assets—total liabilities = net assets). This amount is the total excess earnings, which

are then reduced to present value. The excess earnings (intangible assets) are added to the net assets, reduced to present value, to calculate the fair market value of the practice. Briskey opined that under this method Natalie's work at the hospital must be considered separately from the value of the practice because she was essentially a part-time employee of the hospital, since her privileges were individual to her and not transferable.

Under the market approach, one compares similar businesses and sales to determine the value of the business. Briskey testified that there were no transfers of medical practices in Alaska to compare to Natalie's practice and that other certified public accountants had stated that doctors have walked away from practices because there was no market for medical practices in this state. Briskey testified that the dearth of doctors in the Palmer area allowed a new doctor to come in with his or her own equipment and have a full schedule almost immediately. Using both methods, Briskey concluded that Natalie's practice was worth only as much as the tangible assets minus the practice's liabilities ($156,497) because of the shortage of doctors in the area and the fact that much of Natalie's income is derived from her non-transferable privileges that allow her to perform surgery at the hospital. Briskey calculated Natalie's salary from her practice to be approximately $146,160.

Ronald E. Greisen, also a certified public accountant, valued the practice for Gregory. Greisen valued the practice as of July 31, 1997 using the capitalization of excess earnings method. Greisen valued the tangible assets at $138,733 and the intangible assets at $297,000, giving the practice a fair market value of $435,733. Greisen credited Natalie with a maximum salary of $126,410 in 1996.

The superior court disagreed with Briskey's opinion that Natalie's income from work done at the hospital should not be included in the total gross income of her medical practice. The superior court relied on several facts to support its position: Natalie was not an employee of the hospital, she did not receive a W–2 income statement from the hospital, her services were billed by her

medical office, and payments were paid directly to her office. Thus, the superior court found that Briskey's valuation of the practice was too low.

At the same time, the superior court did not accept Greisen's opinion either. The superior court found that Greisen's computation of Natalie's compensation was too low and that his computation of fixed assets was based on incomplete information. The superior court found that Natalie's salary was $140,000. The court accepted Greisen's computation of $138,733 as the tangible asset value, and the court valued the excess earnings of the practice at $221,692 when reduced to present value. Using the capitalization of earnings method, these valuations led to a fair market value of $360,425.

Based on this valuation and the valuation of the other marital property, the superior court then divided the marital estate in what it considered to be a just and equitable manner. Natalie was awarded the medical practice, the family home, the Land Rover, the truck and camper, the three horses, and the personal property in the family home. Natalie was also assigned the debts on these items and the money owed to the IRS. Gregory was awarded his military retirement, all of the property in Pennsylvania, the property in Palmer, the Fidelity retirement account, the personal property in his possession, a post-separation distribution of funds from a joint checking account, and an increase in credit card debt. In order to equalize the division of marital property, Natalie was ordered to pay Gregory $178,063. Due to the lack of liquidity of Natalie's assets, the parties were ordered to enter into a reasonable agreement for the payment of this sum.

## III. STANDARD OF REVIEW

■ The superior court has broad discretion in fashioning a property division.[1] "The valuation of available property is a factual determination that should be reversed only if clearly erroneous."[2] A finding of fact is clearly erroneous when we are left with a definite and firm conviction that the trial court has made a mistake.[3]

■ We will reverse the superior court's determination of what property is available for division only if we find an abuse of discretion based on our review of the entire record.[4] The superior court's equitable allocation of property is also reviewed under an abuse of discretion standard.[5] We review the denial of a motion for reconsideration for an abuse of discretion.[6] We will find an abuse of discretion only when we are left with a definite and firm conviction that the trial court erred after reviewing the whole record.[7]

## IV. DISCUSSION

A. **The Superior Court Erred by Overvaluing Natalie's Medical Practice at $360,425.**

1. **The superior court erred in undervaluing the tangible assets of the practice at $138,733.**

■ In *Wanberg v. Wanberg*,[8] we explained that division of marital assets involves a three-step process: (1) the trial court determines what specific property is available for distribution; (2) the court then determines the value of this property; and (3) the court decides what allocation is most equitable.[9] In *Merrill v. Merrill*,[10] we held that the trial court must make "sufficiently detailed and explicit findings 'to give the

1. *Edelman v. Edelman*, 3 P.3d 348, 351 (Alaska 2000).

2. *Berry v. Berry*, 978 P.2d 93, 95 (Alaska 1999) (citing *Cox v. Cox*, 882 P.2d 909, 913–14 (Alaska 1994)).

3. *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993).

4. *Berry*, 978 P.2d at 95.

5. *Id.*

6. *Harrelson v. Harrelson*, 932 P.2d 247, 250 (Alaska 1997).

7. *Morgan v. State, Dep't of Revenue*, 813 P.2d 295, 297 n. 4 (Alaska 1991).

8. 664 P.2d 568 (Alaska 1983).

9. *Id.* at 570.

10. 368 P.2d 546 (Alaska 1962).

appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground[s] on which the trial court reached its decision.' " [11]

Natalie argues that, in total, the superior court overvalued her medical practice. But her complaint as to the valuation of the tangible assets by the superior court is that the court selected a value that was too *low*. Natalie argues that the superior court erred when it found that the tangible assets of the practice had a fair market value of $138,733, rather than the $156,497 figure that her expert testified to. Natalie asserts that, since Greisen used the list of assets found in the tax returns for 1992–1996 and looked to no other source, his list of assets was inaccurate and, therefore, so was his valuation. In contrast, Briskey relied on three separate sources to value the fixed assets: the list from the tax returns, a list from Natalie's bookkeeper, and a list prepared by Natalie herself. Briskey stated that she primarily relied on the list prepared by Natalie.

The superior court acknowledged that "Greisen's computation of fixed assets is questionable as it is based on incomplete information." Nonetheless, the court used Greisen's figure for the tangible asset value in which the fixed asset figure was one component. Because the superior court acknowledged that Greisen's figures were questionable and did not attempt to obtain a more accurate figure, it was error to use these figures. We therefore adopt Briskey's valuation, $156,497, of the net assets.

**2. The superior court did not err in finding that the practice has goodwill as calculated by the capitalization-of-the-excess-earnings method.**

 Natalie argues that the superior court erred when it found that the practice had goodwill value. She claims that the

practice actually had no value beyond its tangible assets. In *Moffitt v. Moffitt*,[12] we held that the valuation of goodwill is a two-step process.[13] First, "the trial court must decide whether good will exists." [14] Second, if the superior court determines that goodwill exists, it "then must determine whether the good will could actually be sold to a prospective buyer. If the trial court determines either that no good will exists or that the good will is unmarketable, then no value for good will should be considered in dividing the marital assets." [15] To be clearly erroneous, a superior court's findings of fact with regards to goodwill must be entirely unsupported by the record.[16]

Here, the superior court heard testimony from two experts: Briskey and Greisen. Briskey stated in her report that Natalie's revenue from hospital procedures should not be considered in valuing the practice because Natalie was really acting as a part-time employee of the hospital, her privileges were individual to her and not transferable, and the privileges were renewable at the discretion of the hospital every two years. Briskey testified that Natalie's practice was "a special case really because she's got income in there that really isn't comparable to other internal medicine or other practices of this nature." Briskey went on to state that "if you are trying to compare [Natalie's] practice with other practices, you have to extract that other income." Because Briskey would extract revenues from procedures done at the hospital, her analysis concluded that the practice would actually have a net loss instead of net income.

Greisen disagreed with Briskey's conclusion that the income from Natalie's work at the hospital should not be included in the excess earnings analysis. Greisen testified that Briskey's conclusion that Natalie's work at the hospital was separate from her prac-

**11.** *Id.* at 548 (quoting *Irish v. United States*, 225 F.2d 3, 8 (9th Cir.1955)); *see also* Alaska R. Civ. P. 52(a) (stating in pertinent part "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon ....").

**12.** 749 P.2d 343 (Alaska 1988).

**13.** *Id.* at 347.

**14.** *Id.*

**15.** *Id.*

**16.** *Id.*

tice was a fiction because, in reality, all of Natalie's activities comprised one practice. Greisen believed that Briskey used a novel approach that he had never seen before in the medical profession, even though it is common for doctors to have several locations of practice.

Based on this evidence, the superior court came to the conclusion that Natalie was not an employee of the hospital, she received no compensation from the hospital, and her practice billed and received all payments for procedures Natalie did at the hospital. We have upheld a trial court's determination of goodwill based on the capitalization of excess earnings method and qualified expert testimony.[17] Because Natalie is not contesting Greisen's qualifications as an expert witness and there was ample testimony by Greisen to allow the superior court to find that Greisen's evaluation was sound, the trial court did not clearly err in determining that the practice possessed goodwill. Therefore, we uphold the superior court's finding that the practice had goodwill.

### 3. The superior court erred in finding that the practice's goodwill was marketable.

Natalie argues that the superior court erred in valuing her practice above the fair market value of the tangible assets because the goodwill is personal to her and she would be unable to sell the practice for anything more than the value of the tangible assets. Because there is more demand for physicians than there are physicians to meet the demand, Natalie argues that there is no reason for a physician wishing to open a practice in the Wasilla/Palmer area to buy an existing practice. Natalie argues that a new doctor merely has to obtain equipment and office space and open the office doors to have a full-time practice, so there is no reason for a physician to pay extra for goodwill.

Natalie presented evidence at trial that the practice's goodwill was not marketable.

Briskey testified that she talked with several CPA's in the Anchorage area who indicated that they did not know of any recent sales of medical practices. Briskey also stated that she was told of two doctors who walked away from their practices after they were unable to find buyers. Briskey spoke with the doctor who now shares the practice with Natalie, Dr. Cooney. According to Briskey, Dr. Cooney stated that there was no reason for her to buy into the practice. Natalie testified that she was able to convince Dr. Cooney to share office space with her by providing free office space to Dr. Cooney for four months and then requiring only one-third of the rent for another two months before Dr. Cooney started paying one-half of the rent.

Natalie also testified that the region where she practices is under-served and that she had been trying to get another physician into her practice almost since she started in 1989 but that because there was so much demand for doctors in the area, no one would buy into her practice. Natalie testified that she had 6,000 patients, that she had not been taking new patients for the last several years, and that any internist would only have to buy some equipment and open the office doors to have a practice.

In response to this Alaska-specific evidence, Gregory offered only evidence based on a nationwide scale. Greisen testified that a physician "coming to practice without having a practice and if their alternative was hanging their sign out that says I'm a doctor and wait for the patients to come, they're not going to make the average salary of [$]126,-410." Greisen admitted that he did not have any market data on medical practices in Alaska, but used nationwide data to determine the marketability of Natalie's practice. Greisen also admitted that he was unaware of any practices that had been sold in the area. Greisen offered no other testimony as to the marketability of the practice's goodwill.

---

17. See *Miles v. Miles*, 816 P.2d 129, 131 (Alaska 1991) (stating that "the trial court used an accepted method of business valuation, capitalization of excess earnings, to determine whether goodwill exists. Based on the testimony of William's expert witness, Ronald Griesen, the superior court found that Miles & Associates possessed no goodwill value. Because Greisen was qualified as an expert in business valuation, we find no error in the court's acceptance of his testimony." (citations omitted)).

■ We have held that if the superior court determines that goodwill exists it "then must determine whether the good will could actually be sold to a prospective buyer."[18] Where no market exists for goodwill, it should be considered to have no value.[19] Here, the superior court made no findings regarding whether there was actually a market for the goodwill of the practice. Because the trial court did not make "sufficiently detailed and explicit findings 'to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground[s] on which the trial court reached its decision,' "[20] we must reverse its valuation of goodwill.

■ The superior court failed to make any findings regarding the marketability of the practice's goodwill. Because Natalie offered substantial evidence that the goodwill would not be marketable and Gregory failed to counter that evidence on a regional scale in terms of the Wasilla/Palmer area, or even in terms of Alaska as a whole, the superior court clearly erred in determining that Natalie's practice had a value beyond its tangible assets. Therefore, because Natalie presented substantial evidence that her practice had no marketable goodwill and Gregory presented no substantial evidence to the contrary, the superior court should have adopted Briskey's opinion that the practice had no value beyond the value of its net assets. We thus hold that the practice has a fair market value of $156,497.

**B. The Superior Court Erred in Failing To Include the Loan for the Piano in the Property Distribution.**

Natalie argues that the superior court erred in failing to include the loan for the piano on the list of liabilities.[21] Gregory

agrees that the property distribution order should be amended to include the $7,000 piano debt. To that must be added a $3,000 credit (reflecting the piano's fair market value) to Natalie's net property value, giving a net loss to Natalie of $4,000. On remand, we direct the superior court to amend the property order to reflect this change.

**C. The Superior Court Did Not Err in Valuing the Range Rover at Zero Value instead of a Negative Value.**

■ Natalie asserts that it was clear error to assign the Range Rover a value of $56,000 when she presented evidence at trial that the car was worth only $45,000. Instead, Natalie argues that the superior court should have assigned the car a negative value of $11,789.12, the value of the car minus the balance on the car loan as of December 5, 1996. Gregory argues that, since the Range Rover was purchased only eight months before trial, the superior court was within its discretion in using the promissory note to value both the Range Rover and the balance of the debt instead of requiring more information from the parties or accepting Natalie's testimony of the value.

■ "The valuation of marital property is a factual determination 'which will not be set aside unless it is clearly erroneous.' "[22] The superior court used the promissory note and the balance of the debt on the car to value the car. Natalie testified that the car was worth about $45,000 at the date of separation. Natalie offered no other evidence of the value of the car. Specifically, Natalie did not offer any expert testimony or documentation as to the value of the Range Rover and neither did Gregory. Also, neither party offered any evidence of the balance on the loan as of the date of trial. The superior

18. *Moffitt,* 749 P.2d at 347.

19. *Miles,* 816 P.2d at 131.

20. *Merrill v. Merrill,* 368 P.2d 546, 548 (Alaska 1962) (quoting *Irish v. United States,* 225 F.2d 3, 8 (9th Cir.1955)); *see also* Alaska R. Civ. P. 52(a) (stating in pertinent part "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . . .").

21. *See Lacher v. Lacher,* 993 P.2d 413, 421 (Alaska 1999) (stating "[w]hen dividing property between divorcing parties, the trial court must distribute all assets acquired during marriage.").

22. *Sloane v. Sloane,* 18 P.3d 60, 64 (Alaska 2001) (quoting *Musser v. Johnson,* 914 P.2d 1241, 1242 (Alaska 1996)).

court was not required to procure its own evidence on the value of the Range Rover. We hold that the superior court did not clearly err in adopting the value reflected on the promissory note instead of relying on Natalie's testimony. We affirm the superior court's valuation of the Range Rover.

## V. CONCLUSION

Because the superior court failed to make findings as to the marketability of the goodwill of Natalie's medical practice, we REVERSE its conclusion concerning the value of the practice. Because the evidence allows no other conclusion, we hold that the practice had no marketable goodwill. We adopt the net asset value of $156,497. Because the piano debt was not included in the property division, we REMAND this issue so that the court may amend the list accordingly. We AFFIRM the superior court's valuation of the Range Rover.

On remand the court should adjust the property division in accordance with this opinion. If the court decides to continue to divide the parties' property equally, the equalizing payment due Gregory from Natalie will be approximately $74,099.[23] If the court determines that it is no longer just to divide the parties' property equally, the court is authorized to make adjustments in the property division supported by appropriate findings of fact and conclusions of law.

---

**23.** Calculated by deducting from Natalie's net recovery, $613,243, the over-valuation of her practice, $203,928 ($360,425–$156,497) and the net negative value of the piano, $4,000, for a new net recovery of $405,315. This, when added to

Gregory's net recovery of $257,117, represents the total net marital property. A 50/50 division would thus be $331,216 [($405,315 + $257,-117)/2]. This exceeds Gregory's net recovery by $74,099.