*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LYDIA MAY, f/k/a Lydia Petersen, | ) | |
| | ) | Supreme Court No. S-18642 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-20-08063 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JON-MARC PETERSEN, | ) | |
| | ) | No. 7756 – March 14, 2025 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: Kara A. Nyquist and Jessica Falke, Nyquist Law Group, Anchorage, for Appellant. Lynda A. Limón, Limón Law Firm, Anchorage, and Randi R. Vickers, Law Offices of Randi R. Vickers, Anchorage, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

PATE, Justice.
CARNEY, Justice, dissenting.

## I. INTRODUCTION

A husband and wife divorced after 19 years of marriage. After a trial, the superior court divided marital assets 60/40 in favor of the wife. The wife appeals the property division, primarily challenging the court's valuation of the husband's law

practice. She contends that the court erroneously found that the law firm lacked any marketable goodwill and consequently undervalued the firm. She also challenges the court's treatment of a $75,000 payout from the marital estate as a pre-distribution rather than interim support and argues the court erred in "offsetting" adoption subsidies the couple receives from the State against the husband's child support obligation.

We affirm the superior court's decision. Only marketable goodwill may be divided on divorce, and the evidence in this case shows that the law firm lacked any marketable goodwill. We likewise conclude that there was no error in the court's other decisions, including its decision to award a pre-distribution in lieu of interim spousal support and its temporary adjustment of the child support obligation to account for the adoption subsidy payments.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Lydia May and Jon-Marc Petersen separated in July 2020 after 19 years of marriage. They have six children, including four adopted children who were minors at the time of the divorce. They receive state adoption subsidy payments totaling $3,256 per month.

Petersen is an attorney who has been in private practice since 2007. He is a partner in a law firm, in which he has a 50% ownership interest. His income varies significantly year-to-year, but at the time of trial he had averaged a pre-tax income of roughly $500,000 per year over the preceding six years.

May worked full-time as a nurse until 2011, when she shifted to part-time work for a few years to care for the parties' children and pursue a master's degree. She now has a master's degree in nursing. She operated her own clinic, Restoration Wellness, between 2017 and 2021. Restoration Wellness was not profitable and closed in 2021. At the time of trial, May worked for a clinic as a family nurse practitioner for a base pay of $120,000 per year.

**B.  Proceedings**

After filing for divorce, May sought $5,000 per month in interim spousal support in October 2020.  The superior court denied this request in December 2020, but ordered that May receive a pre-distribution of $75,000 from her portion of the marital estate.

The superior court next held a four-day custody trial and issued a custody decree in September 2021 ordering 50/50 shared physical custody.[1]  A five-day property trial was then held in April and May 2022.  The primary issue at trial was the value of Petersen's 50% ownership interest in his law firm.  May's expert, Jacqueline Briskey, valued the marital portion of the firm at approximately $2,000,000.  Petersen's expert, Susan Trimble, valued the entire firm at $22,000.  The court also heard testimony from Richard Payne, Petersen's law partner, who described the firm's structure, contracts, and business development efforts.  The director of the Office of Public Advocacy (OPA) and the deputy municipal attorney for the Municipality of Anchorage likewise testified to contracts the firm holds with OPA and the Municipality, respectively.  The parties also disputed the marital classification of an office building in Wasilla and attorney's fees from cases Petersen worked on during the marriage.

The court issued its decree of divorce and judgment in January 2023.  It found that the parties' most significant asset was the marital home and that the equity in the home totaled approximately $500,000.  Other significant marital assets included a building owned by May's clinic that sold for approximately $100,000 in May 2021 and May's retirement account, valued at approximately $35,000.

The court found that the law firm lacked any marketable goodwill and that its fair market value was therefore the value of its net assets, a total of $22,000.  The court also found that the Wasilla office building used by the firm was not a marital asset

---

[1]    Custody is not at issue in this appeal.

and therefore should be excluded from valuation of the marital portion of the firm. It credited Petersen's testimony as to the marital value of attorney's fees for cases he worked on during the marriage. Based on these findings, the court valued the marital estate at $370,493.25, which it divided 60/40 in favor of May. The court awarded the home to Petersen and calculated an equalization payment of $102,753 owed by Petersen to May. The superior court declined to award attorney's fees to either party.

The superior court also calculated a monthly child support obligation of $1,437.08 for Petersen, but, noting that May was receiving the entire adoption subsidy despite the couple sharing 50/50 physical custody of three of the children, reduced the monthly obligation to $216.08 for so long as May continued to receive the subsidy payments. It explained that this reduction reflected half the value of the relevant adoption subsidy payments for three of the children.[2] May moved for reconsideration, which the court denied.

May appeals.

## III. STANDARD OF REVIEW

"The division of property in a divorce action is a matter committed to the discretion of the trial court."[3] Alaska courts use a three-step process to equitably divide property in a divorce: "(1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[4] The first step may involve both legal and factual questions; the former are reviewed de novo

---

[2]  One child remains in May's primary custody, while custody of the other three adopted children is 50/50. The subsidy payment for those three children is $2,442, or three quarters of $3,256, the total amount of the subsidy for all four children. Petersen's half of that subsidy is $1,221, which is $216.08 short of his child support obligation of $1,437.08. Therefore, the superior court ordered Petersen to pay the difference of $216.08 monthly, rather than paying the full amount of $1,437.08 and then being owed $1,221 in return.

[3]  *Miller v. Miller*, 105 P.3d 1136, 1139 (Alaska 2005).

[4]  *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021).

and the latter for clear error.[5] The second step is a factual determination reviewed for clear error.[6] The third step is reviewed for abuse of discretion.[7]

"The existence, marketability, and calculation of goodwill present questions of fact, which we will set aside only for clear error."[8]

## IV.   DISCUSSION

At its core, the difficulty in this case is the disparity between the high earning capacities of the parties, particularly Petersen, and the relatively small size of the marital estate. Both parties enjoyed an affluent lifestyle during the marriage and, as the superior court found, they "prioritized providing comfortable lives for and meeting the needs of their six children." These choices have left them with few assets to distribute to smooth the often-expensive transition to post-divorce life.

May is an educated professional with an above-average income, but will doubtlessly face difficulties adjusting to a lower income after a long marriage to a higher-earning spouse. The superior court attempted to account for the disparity in the parties' earning capacities by awarding May a larger share of the marital estate, but its valuation of the law firm meant there simply were not enough assets in the marital estate to produce what May believes is an equitable division. Although an award of spousal support may often be appropriate under such circumstances, May did not request such an award from the superior court.

May broadly argues that the superior court's property division was inequitable. She argues the court undervalued Petersen's law firm, misclassified certain firm assets, abused its discretion by treating a $75,000 payout from the marital estate as a pre-distribution rather than interim spousal support, and erred in its division of

---

[5]   *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015).

[6]   *Id.*

[7]   *Id.*

[8]   *Hansen v. Hansen*, 119 P.3d 1005, 1010 (Alaska 2005).

adoption subsidies the couple receives. She additionally argues the court abused its discretion in denying her request to reopen evidence and erred in declining to award long-term spousal support, above-guidelines child support, or additional attorney's fees.

We do not identify any clear errors in the superior court's findings or any abuse of discretion in its determinations. We therefore affirm the decision of the superior court.

**A. The Superior Court Did Not Err In Its Valuation Of The Law Firm.**

The primary issue on appeal is whether the superior court erred in its valuation of Petersen's law firm, Denali Law Group (DLG). May argues the court erred by finding there was no marketable goodwill and crediting a valuation from Petersen's expert that was based only on DLG's tangible assets. May also argues that the court erred both in its treatment of an office building, which was purchased by Petersen and Payne and rented to the firm, and its treatment of the firm's cash on hand.

We see no error in the court's valuation of DLG. Our case law permits only marketable goodwill to be divided on divorce. The evidence supports the court's finding that DLG lacked any marketable goodwill. The court accordingly did not err in finding DLG should be valued only on its tangible assets and crediting Petersen's expert's valuation. We reject May's other challenges to the court's valuation of the law firm.

**1. Only marketable goodwill may be valued and divided on divorce.**

"The goodwill of a professional corporation is property which may be includable in the marital estate in a divorce proceeding."[9] If the superior court finds that a professional corporation possesses goodwill, it must then determine whether that

---

[9] *Richmond v. Richmond*, 779 P.2d 1211, 1213 (Alaska 1989), *overruled in part on other grounds by Hansen*, 119 P.3d at 1010 & n.16.

goodwill "could actually be sold to a prospective buyer."[10]  If the goodwill cannot be sold, it may not be included in the marital estate.[11]  There are two relevant types of goodwill:  enterprise goodwill, which can be sold, and personal goodwill, which cannot.

Enterprise goodwill, also called business goodwill, was defined in one foundational decision as "nothing more than the probability that the old customers will resort to the old place."[12]  A business's continued operations lead it to develop ongoing relationships with employees, customers, and suppliers, creating a "beaten pathway from the seller to the buyer, usually established and made easy of passage by years of effort and expense in advertising, solicitation, and recommendation."[13]  Crucially, this type of goodwill is marketable — it can be sold, transferred, conveyed, or pledged.[14]  Purchasers will often pay a premium to acquire an established business in order to take over its existing relationships, rather than developing new relationships from scratch.[15]

---

[10]     *Moffitt v. Moffitt*, 749 P.2d 343, 347 (Alaska 1988).

[11]     *Richmond*, 779 P.2d at 1213; *Hansen*, 119 P.3d at 1010.

[12]     *Cruttwell v. Lye* (1810) 34 Eng. Rep. 129, 134; 17 Ves. Jun. 335, 346; *see also See v. Heppenheimer*, 61 A. 843, 846 (N.J. Ch. 1905) (describing Lord Eldon's decision in *Crutwell* as containing "the germ of all the more modern and complete definitions").

[13]     *Rowell v. Rowell*, 99 N.W. 473, 478 (Wis. 1904); *see Taylor v. Taylor*, 386 N.W.2d 851, 857-58 (Neb. 1986) (defining enterprise goodwill as including "recurrent customer patronage" and noting "many commercial enterprises" possess this type of goodwill).

[14]     *Taylor*, 386 N.W.2d at 859.

[15]     *See In re Brown*, 150 N.E. 581, 582 (N.Y. 1926) (Cardozo, J.) ("Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition.  Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers.  It is then known as good will." (citation omitted)).

The value of the business's enterprise goodwill is equivalent to the value of this premium on sale.[16]

Personal goodwill, by contrast, is associated with a particular person rather than a particular business or brand name. This form of goodwill reflects the "skills, knowledge, efforts, training, or reputation" of an individual.[17] Its value depends on the continued presence of that individual, and it cannot be sold or transferred.[18] This form of goodwill is often found in skilled service professions where consumers develop relationships with individual professionals, such as doctors or lawyers.[19]

We cannot treat personal goodwill and enterprise goodwill the same because doing so would frustrate one of the aims of divorce: allowing divorcing parties

---

[16]     *See Taylor*, 386 N.W.2d at 858.

[17]     *Goodwill*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see Taylor*, 386 N.W.2d at 858 (describing personal goodwill as "nothing more than probable future earning capacity"); Allen Parkman, *The Treatment of Professional Goodwill in Divorce Proceedings*, 18 FAM. L.Q. 213, 221-23 (1984) (criticizing courts' conflation of these types of goodwill and arguing personal goodwill is better understood as human capital).

[18]     *See Sorensen v. Sorensen*, 839 P.2d 774, 775 (Utah 1992) (explaining personal goodwill of sole practitioner is "nothing more than his or her reputation for competency"); Note, *Voluntary and Involuntary Sales of Goodwill*, 27 HARV. L. REV. 670, 670-71 (1914) (distinguishing between "the advantages from custom or business connection," which are assignable property, and "the friendliness of the public enjoyed by the particular man himself," which is "by nature unassignable"). For our treatment of a similar asset, see *Nelson v. Nelson*, 736 P.2d 1145, 1146-47 (Alaska 1987) (holding professional degree may not be divided because it is personal to holder and cannot be sold). *See also Sorensen*, 839 P.2d at 776 (analogizing personal goodwill to professional degree).

[19]     *See, e.g.*, *Richmond v. Richmond*, 779 P.2d 1211, 1213-14 (Alaska 1989) (law firm), *overruled in part on other grounds by Hansen v. Hansen*, 119 P.3d 1005, 1010 & n.16 (Alaska 2005); *May v. May*, 589 S.E.2d 536, 549-50 (W. Va. 2003) (dental practice); *Taylor*, 386 N.W.2d at 858-59 (medical practice).

to make a clean break and move on with their lives.[20] If a party to a divorce is awarded a business with *marketable* goodwill and ordered to pay half the value of that goodwill to the other party, the party that receives the business can always sell the business. While not always desirable, the sale allows the party to immediately realize the value of the marketable goodwill and generate the funds necessary to satisfy the property award.

If a court were to divide personal goodwill, by contrast, there could be no clean break because personal goodwill can only be realized through future earnings.[21] In practice, making payments on an award of personal goodwill could require the business-owning spouse to continue in their current line of work, unable to "leave the business, change careers, go into public service, return to school, or any number of other possibilities."[22] We have rejected this approach, expressing concern about both the restrictions this would impose on the business-owning spouse and the fact that property

---

[20] *See Jones v. Jones*, 835 P.2d 1173, 1179 (Alaska 1992) (noting undesirability of requiring ongoing financial relationship in absence of existing legal relationship); *see also Broadhead v. Broadhead*, 737 P.2d 731, 739 (Wyo. 1987) (explaining goal of property division is to allow parties "to make a clean break, and . . . go his or her separate way, starting anew with an uninhibited life"); *Gardner v. Gardner*, 748 P.2d 1076, 1079 (Utah 1988) ("The purpose of divorce is to end marriage and allow the parties to make as much of a clean break from each other as is reasonably possible.").

[21] *See Nail v. Nail*, 486 S.W.2d 761, 764 (Tex. 1972) (explaining personal goodwill is "wholly dependent upon the continuation of existing circumstances").

[22] *Moffitt v. Moffitt*, 749 P.2d 343, 347 & n.3 (Alaska 1988); *see also Holbrook v. Holbrook*, 309 N.W.2d 343, 355 (Wis. App. 1981) (acknowledging "disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value").

awards cannot be modified to reflect any future change in financial circumstances.[23] Such an award would be, in practice, a less flexible and less desirable form of spousal support. We have accordingly rejected the idea of treating unmarketable personal goodwill as property subject to division.[24]

A spouse who makes "direct and indirect contributions to the success" of the other spouse's professional practice will often be unable to directly realize the value of those contributions on divorce.[25] We acknowledge that this rule can produce frustrating results,[26] but the disadvantaged spouse is not without remedy. As we have observed in the analogous context of the division of professional degrees, the "earning ability of the parties and their conduct during the marriage are relevant to a property division," and one spouse's position as a partner in a reputable professional firm is a

---

[23] *Moffitt*, 749 P.2d at 347 n.3 (favoring an approach that finds good will is unmarketable and ought not be considered when dividing marital assets); *see also McCarter v. McCarter*, 303 P.3d 509, 513-14 (Alaska 2013) ("[P]rovisions of a decree adjudicating property rights . . . constitute a final judgment not subject to modification." (quoting *Keffer v. Keffer*, 852 P.2d 394, 396 (Alaska 1993))).

[24] *Moffitt*, 749 P.2d at 347 & n.3.

[25] *Richmond v. Richmond*, 779 P.2d 1211, 1220-21 (Alaska 1989) (Rabinowitz, J., dissenting).

[26] Perceived inequities have led a handful of other jurisdictions to attempt to value and divide personal goodwill. *See, e.g.*, *In re Marriage of Stufft*, 950 P.2d 1373, 1378-79 (Mont. 1997). But the rule announced in *Richmond* is well established, and we will overturn a prior decision only when we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from departure." *Ito v. Copper River Native Assoc.*, 547 P.3d 1003, 1015-16 (Alaska 2024) (quoting *State v. Carlin*, 249 P.3d 752, 756 (Alaska 2011)). And notably, May has not asked us to overturn our rule in *Richmond*, and she expressly disavowed such a request at oral argument. Further, our rule aligns with the standard used in the plurality of other jurisdictions. *See, e.g.*, *In re Marriage of Maxwell*, 876 P.2d 811, 813 (Or. App. 1994); *Stonehocker v. Stonehocker*, 176 P.3d 476, 489-90 (Utah App. 2008); *Taylor v. Taylor*, 386 N.W.2d 851, 858-59 (Neb. 1986); *see also May v. May*, 589 S.E.2d 536, 545 & n.16 (W. Va. 2003) (collecting cases).

proper factor to consider in dividing the marital estate.[27]  If one spouse's significant contributions to the earning potential of another have manifested only as unmarketable personal goodwill, the proper remedy will often be a division of property favorable to the contributing spouse.[28]  If there is "no substantial property to divide," an award of spousal support is appropriate if such an award "is both 'just and necessary' " to address a disparity in the financial needs and earning power of the parties.[29]

### 2. The superior court did not clearly err in finding Petersen's law firm lacked any marketable goodwill.

The superior court found that DLG lacked any marketable enterprise goodwill.  The court found that the firm's goodwill was "dependent on the presence of Jon-Marc" and his partner and attributable solely to their efforts and reputation.  It observed that there was "no evidence that there is a market to purchase DLG" and that the firm's goodwill "could not actually be sold to a prospective buyer."  The superior court accordingly found that the firm "has no value beyond the value of its net assets" in the property division and accepted a valuation that excluded any goodwill value.

May raises two challenges to the court's finding.  First, she argues that the valuation of the firm itself was inaccurate, pointing to higher valuations produced by different methods that incorporated estimates of the value of the firm's goodwill.

---

[27]  *Nelson v. Nelson*, 736 P.2d 1145, 1147 (Alaska 1987); *see also May*, 589 S.E. 2d at 547 (explaining personal goodwill is not itself subject to division, but "may affect property division and alimony").

[28]  *See, e.g.*, *Rhodes v. Rhodes*, 754 P.2d 1333, 1335 (Alaska 1988) (approving unequal division of property in light of wife's contributions to husband's earning capacity).

[29]  *Nelson*, 736 P.2d at 1147 (quoting former AS 25.24.160(3) (renumbered as AS 25.24.160(a)(2))); *see Hockema v. Hockema*, 403 P.3d 1080, 1089 (Alaska 2017) (explaining that trial courts "should, where possible," address financial needs through property distribution, but that limited spousal support is permissible if "necessary to address a disparity in the parties' financial needs and earning power").

Second, she argues that the firm's contracts could be sold and could serve as a proxy for the marketable value of the firm. Neither challenge is successful.

### a. The law firm

The court's finding that the law firm had no marketable enterprise goodwill is supported by the record. Demonstrating the presence and value of enterprise goodwill in a professional practice requires evaluating the amount another professional would pay for that goodwill in acquiring the practice.[30] Neither party introduced evidence that would support a finding of marketable goodwill, such as "a recent actual sale of a similarly situated" Alaska law firm, an offer to purchase such a practice, or expert testimony as to the existence of goodwill in similar practices.[31]

Petersen's expert, Suzanne Trimble, testified that it is "difficult to sell professional practices in our community," giving an example of a law firm she

---

[30] *Richmond*, 779 P.2d 1211. In *Richmond*, we concluded that a solo practitioner had no marketable goodwill, but suggested marketable goodwill might exist in a multi-lawyer firm "upon evidence of sales or purchases of partnership interests." *Id.* at 1213-14 & n.4. *Richmond*'s distinction between solo practitioners and multi-lawyer firms is an artifact of ethical rules that prohibited the sale of solo practices, but effectively permitted multi-lawyer firms to be sold. *See* Dennis A. Rendleman, *The Evolving Ethics of Selling a Law Practice*, GPSOLO, July/Aug. 2012, at 10; Stephen E. Kalish, *The Sale of a Law Practice: The Model Rules of Professional Conduct Point in a New Direction*, 39 U. MIAMI L. REV. 471, 471-73 & n.6 (1985) (observing ethical rules generally barred solo practitioners, but not multi-lawyer firms, from "realizing some value for their goodwill" by selling their practices).

The rule barring the sale of law practices no longer prevails, *see* Alaska R. Prof. Conduct 1.17, and even a sole proprietorship may have marketable goodwill so long as sufficient evidence shows a market for the goodwill of such firms exists. *See Hansen v. Hansen*, 119 P.3d 1005, 1010 (Alaska 2005) (holding existence and value of goodwill are questions of fact); *Hanson v. Hanson*, 738 S.W.2d 429, 435-36 (Mo. 1987) (discussing permissible forms of evidence of existence of goodwill); *Traczyk v. Traczyk*, 891 P.2d 1277, 1280-81 (Okla. 1995) (finding marketable goodwill in solo medical practice), *superseded by statute on other grounds as recognized in Cox v. Kansas City Life Ins. Co.*, 983 P.2d 1025, 1028 (Okla. 1999).

[31] *See Hanson*, 738 S.W.2d at 435.

attempted to value, only for all of its associates to leave to start their own firms. May's own expert, Jacqueline Briskey, testified that "there's not a ready market for a quick sale" of a law practice like DLG. And Petersen testified that no market exists for law practices in Alaska. In light of the lack of any contrary evidence, it was not clear error for the superior court to credit this testimony, and it was not error to find the firm lacked any marketable goodwill.[32]

Having found no marketable goodwill, the superior court did not err in accepting Trimble's valuation of the firm at $22,000. Estimates of the value of a business must be based on "one or more principled methods of valuation" and not mere speculation.[33] Trimble valued the firm based on the fair market value of its net assets. May argues that this methodology is not typical for a law firm and that other methods produced higher valuations, pointing to her expert's calculation of the firm's value, based on a capitalization-of-earnings method, at over $5 million. But while other methods are frequently appropriate when marketable goodwill exists, we have approved the use of the asset-based approach to value businesses that lack any marketable goodwill.[34] All of the other estimates May references included nonmarketable personal goodwill. The court did not clearly err by accepting Trimble's valuations after determining the business lacked any marketable goodwill.

---

[32]    May points to the portion of Trimble's report that attempted to value the law firm based on sales of other law firms in the lower 48. But Trimble testified that there were not any sales in her database for Alaska, so this evidence cannot by itself establish that Petersen's practice had any marketable goodwill value.

[33]    *See Moffitt v. Moffitt*, 749 P.2d 343, 347-48 (Alaska 1988).

[34]    *See, e.g.*, *Manelick v. Manelick*, 59 P.3d 259, 265 (Alaska 2002) (holding that business with no marketable goodwill "had no value beyond the value of its net assets"); *Richmond*, 779 P.2d at 1213-14.

We stress that we do not hold that marketable business goodwill may *never* exist in a professional practice like a law firm.[35] If evidence establishes that a professional practice's goodwill may be sold, the court should determine whether the goodwill is marketable; if it is, it should be considered in the marital estate.[36] But no such evidence was presented in this case. The court accordingly did not clearly err in finding that the goodwill associated with DLG is entirely personal and cannot be sold.

### b. The firm's contracts

Absent any evidence of a market for the law firm's goodwill, May theorizes that another lawyer might purchase DLG in order to acquire the firm's contracts with OPA and the Municipality of Anchorage. She argues that these contracts "would carry on if the firm ownership changed" and that DLG therefore had "clear marketable value." This theory is not supported by the record.

The superior court found that there was no evidence of a market for the firm's contracts, a finding that is well-supported by the record. The OPA Director testified that it "wouldn't make sense to [him] conceptually" for a lawyer to attempt to buy the contract because OPA is "always looking for additional contractors" and he would be "more than happy to give an OPA contract" to any qualified practitioner, obviating any need for an attorney to pay to acquire DLG's contract. The deputy municipal attorney for Anchorage likewise testified that she thought any benefit from

---

[35] Indeed, in some states, there is a thriving market for the professional goodwill of law firms. *See, e.g.*, Erin Mulvaney, *Why Arizona Law Firms Are a Hot Investment for Private Equity*, WALL ST. J. (Mar. 20, 2024, 4:38 PM ET), https://www.wsj.com/us-news/law/smart-money-in-bed-with-lawyers-why-wall-street-is-investing-in-arizona-law-firms-7b0ec2a1. But neither party identifies any evidence in the record that such a market exists in Alaska.

[36] *See, e.g.*, *Hanson*, 738 S.W.2d at 435-36 (discussing permissible forms of evidence of marketable goodwill in professional firm); *Traczyk v. Traczyk*, 891 P.2d 1277, 1280-81 (Okla. 1995) (approving of reliance on database of goodwill values in healthcare practices to determine marketable goodwill of clinic). We do not endorse any particular valuation method in this case.

buying the municipal contract from DLG would be "short-lived" because anyone could bid for the contract when it came up for renewal.

The testimony of these witnesses further supports the superior court's finding that the firm's goodwill was entirely personal to Petersen and his law partner, Payne. The OPA director testified that the firm's current contract is "pretty specific to the fact that Jon-Marc Petersen and Richard Payne are involved with it" and "really does hinge on both of those individuals being part of that." While he would be "willing to entertain" continuing the contract if a qualified attorney bought the firm, he would first assess whether that attorney "had that ability" and "could handle that." The deputy municipal attorney testified similarly, stating that, if Petersen's share were bought out, the Municipality would assess whether the new partner or partners had "substantial criminal law experience" and "all the necessary tools to perform." If not, the Municipality would have the authority to cancel the contract and put it out to bid. Neither contract is freely assignable or marketable without consent, so an attorney purchasing the firm would have no guarantee of actually acquiring either of the contracts.

The process by which both contracts were awarded confirms the superior court's finding that these relationships depend on the personal goodwill of Petersen and his law partner, not the reputation or brand name of the law firm. The firm was encouraged to bid on the Municipality contract by the municipal attorney, who had a close relationship with Petersen's law partner. The deputy municipal attorney testified that the award process looks "primarily at the responsible attorneys," and Petersen's partner testified that "the buck stopped with me" on all matters under the contract with the Municipality. Likewise, Petersen testified that he was able to negotiate the OPA contract in part because OPA "knew and respected" him. His partner confirmed that the original contract was "all Jon-Marc's relationship" with the OPA director at the time. The OPA director testified that the two individual attorneys were the "driving force behind this particular contract coming to fruition" with OPA. All of this testimony

demonstrates that the contracts were a product of the personal reputation and skills of Petersen and Payne, components of personal goodwill that could not be transferred to another attorney.

Marketable enterprise goodwill is the premium that a willing buyer would pay to acquire DLG's contractual relationships with OPA and the Municipality, based on DLG's "established relations" with those clients.[37] May has not shown that a market exists for either of these contracts. To the contrary, the testimony of both the OPA director and the deputy municipal attorney clearly establish that these contracts depend on the presence of Petersen and Payne, not merely the DLG brand name, and that any purchaser of DLG would not necessarily acquire its good reputation or even take over any of its contracts. The superior court therefore did not err in finding that the existence of the contracts did not establish the law firm possessed any marketable goodwill.

### 3. The superior court did not clearly err in its categorization of the Wasilla office building.

May also contends the superior court erred by finding that the Wasilla office building was not a marital asset. The court explained that the building was purchased by an LLC owned by Petersen's business partner Richard Payne and his wife and paid for by draws from the law firm taken by Petersen and Payne at the end of 2020. Petersen testified that the building would be leased by Payne's LLC to DLG to serve as office space for the firm.

May argues that Petersen "intentionally manufactured the way that the building was legally purchased" in order to shield marital assets from the property division. She alleges the building was purchased with marital funds and that the building is an asset of the marital portion of the law firm.

---

[37] *DeSalle v. Gentry*, 818 N.E.2d 40, 47 (Ind. App. 2004) (holding enterprise goodwill is based on business's "established relations with employees, customers, and suppliers").

The court's finding that the building was not marital property is supported by the record. Petersen testified that the building was purchased using post-separation income, not marital funds. He explained that he was originally not going to be involved in purchasing the property because of the divorce and his inability to afford the purchase, but that he changed his mind after he received a distribution from his law firm following a large settlement that occurred after the parties separated in July 2020.

Although May suggests this testimony was inconsistent with Petersen's subsequent statement that the divorce had nothing to do with the fact that the property was owned by Payne's LLC, the two statements can be reconciled: Petersen was not attempting to conceal funds, but rather was unsure of his financial ability to contribute to the purchase because of the divorce, which is why Payne and his wife were initially the only names on the LLC. The large settlement, which consisted primarily of post-separation income, ensured Petersen would have the cash available to join in the purchase. The superior court's finding that an asset purchased with non-marital funds was separate property is not clearly erroneous.

### 4. The superior court did not clearly err in its finding that the law firm had no excess cash.

Finally, May argues the superior court clearly erred in finding that DLG had no excess cash. She argues that the firm did have excess cash and that it should have been added to the valuation. The court based its finding on a balance sheet reporting that DLG had $1,336,360 in total assets and $623,654 in liabilities, as well as Trimble's adjustments to that balance sheet to remove the non-marital portion of a settlement in a personal injury case that accounted for the difference between assets and liabilities.

May argues that this finding was clearly erroneous because it was not obvious that the roughly $700,000 in "excess cash" actually came from a post-separation settlement or was otherwise based on post-separation work. She contends that the settlement "should have been accounted for as [income to the marital business]

in the business valuation" and speculates that DLG will distribute all $1.3 million in assets on its balance sheet to the partners in the following year.

The court's finding that DLG had no excess cash is well supported by the record. Trimble testified that she removed 70% of a fee from a case that settled on November 30, 2020, or around five months after the parties separated. The 70% reduction reflected Petersen's estimate that 70% of his time spent on that case came after the parties separated. The trial court explicitly credited Petersen's testimony on the marital portion of this settlement. The effect of this adjustment is to leave no excess cash in the firm's account. Trimble also explained that she estimated that the firm needed to retain approximately $270,000 for future working capital needs, and Petersen testified that the firm had to reserve some funds to cover its $1.2 million annual payroll. Particularly in light of the strong deference we afford a trial court's factual findings that require evaluating and weighing witness credibility and conflicting oral testimony,[38] it was not clear error for the superior court to credit this evidence and conclude that DLG had no excess cash.

**B.** **The Superior Court Did Not Abuse Its Discretion By Declining To Award Interim Spousal Support.**

May challenges the superior court's decision not to award her interim spousal support. May requested $5,000 a month in interim spousal support in October 2020. The court denied this request, but awarded her $75,000 as a pre-distribution of her share of the marital estate. The $75,000 amount reflected May's share of the marital portion of a case settlement that Petersen received around that time from his law firm. The court's order explained that this distribution would enable May "to pay interim attorney's fees and reasonable and necessary living expenses." The court also noted that issues of spousal support and attorney's fees "remain[ed] reserved for trial."

---

[38] *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007).

Although May later made another motion for attorney's fees, she did not request interim support at any other point before trial.

May requested in her written closing argument that Petersen not be awarded a credit for the $75,000 and that the court instead treat it as "reasonable interim spousal support." Although she did not request interim spousal support after her initial request in October 2020, she argued that she should have been receiving spousal support "throughout the pendency of this action."

The court included this $75,000 pre-distribution in the property division and declined to treat it as interim spousal support. May's motion for reconsideration argued that the court should have treated this award as reorientation support, but the superior court denied this motion.

The award of interim spousal support is committed to the sound discretion of the superior court and reviewed for abuse of discretion.[39] In deciding whether to award interim support, the superior court should consider the parties' "relative economic circumstances, earning capacities, and ability to pay,"[40] and its decision must be based on "sufficient factual findings concerning the parties' needs and ability to pay."[41] Interim support payments are distinct from awards made in the property division.[42]

We see no abuse of discretion in the court's decision. Evidence in the record supports the court's finding that May did not need interim spousal support in October 2020. The court found that, at that time, Petersen "paid the significant majority of the household expenses, provided funds to [May], and paid other marital bills." The court also found that Petersen had provided additional funds to maintain May's business

---

[39] *Brennan v. Brennan*, 425 P.3d 99, 105 (Alaska 2018).

[40] *Hanson v. Hanson*, 125 P.3d 299, 309 (Alaska 2005).

[41] *Beal v. Beal*, 88 P.3d 104, 112 (Alaska 2004).

[42] *Lewis v. Lewis*, 785 P.2d 550, 553-54 (Alaska 1990).

after separation, Petersen testified he was routinely paying bills and providing financial support during this period, and an affidavit he submitted in support of his opposition to the interim support award stated he was "pay[ing] all the household expenses," including insurance and groceries. It was not an abuse of discretion to conclude, in light of both parties' economic circumstances and needs, that an award of $5,000 in monthly interim support was not necessary.

To the extent May needed additional funds to establish a new household, it was appropriate to award a pre-distribution rather than interim spousal support. May requested interim support that would continue until the trial. But the record indicates May needed a one-time payment to cover the significant expenditures involved in establishing a new household, more akin to an award of reorientation support than long-term support to supplement her income.[43] The court found that the pre-distribution was used to "pay bills, rent, and attorney fees, and to purchase furniture and clothes," a finding supported by a demonstrative exhibit that showed May spent the entire pre-distribution in less than two months in early 2021 while establishing a new household.

After spending her pre-distribution award from the marital estate, May returned to the workforce in a high-paying job and did not again request interim spousal support. Although not determinative, the fact that she did not request interim support in the months following her initial October 2020 request further suggests she did not need interim support.

Given the disparities in the parties' incomes, an award of interim spousal support may have been appropriate. But the superior court made sufficient factual findings regarding the economic circumstances of the parties to support its conclusion that the pre-distribution of $75,000 would be adequate to meet May's financial needs prior to trial. The decision to award a pre-distribution was effectively a finding that

---

[43] *See Davila v. Davila*, 908 P.2d 1025, 1026-27 (Alaska 1995).

May could support herself out of her portion of the marital assets.[44]  The court took into account May's needs and ability to pay and approved an award that allowed her to cover her reasonable and necessary living expenses out of her share of the marital estate.  The court's decision not to award interim support therefore did not exceed the broad discretion we afford the superior court on interim awards.

C.    **The Superior Court Did Not Err In Temporarily Reducing Petersen's Child Support Obligation To Account For The Adoption Subsidy Payments.**

The evidence at trial showed that the parties were receiving a monthly adoption subsidy payment of $3,256.  At the time of trial May was receiving the entire payment.  The superior court calculated Petersen's monthly child support obligation as $1,437.08, but found that he was "entitled to a credit of $1,221 for his half of the subsidy payments for the three children," resulting in a final child support obligation of $216.08 per month.  May argues this was error, citing our holding in *Martin v. Martin* that adoption subsidies should not be included in calculating a parent's income under Civil Rule 90.3.[45]

The superior court did not err, although its use of the term "credit" may have caused some confusion.  As income to the child, adoption subsidy payments should follow the child, typically mirroring the physical custody arrangement ordered by the superior court.[46]  Adoption subsidies should not be treated as a credit when calculating the child support obligation.  Adoption subsidies are intended to increase the funds available to care for the child, and crediting an adoption subsidy to reduce a

---

[44]    *See Stevens v. Stevens*, 265 P.3d 279, 290 (Alaska 2011) ("A party's economic situation includes the divorce property division . . . .").

[45]    303 P.3d 421, 427 (Alaska 2013).

[46]    *See Hamblen v. Hamblen*, 54 P.3d 371, 374-75 (Ariz. App. 2002) (holding noncustodial parent not entitled to credit for value of adoption subsidy), *cited in Martin*, 303 P.3d at 427 n.19; *In re Marriage of Bolding-Roberts*, 113 P.3d 1265, 1267-88 (Colo. App. 2005) (same).

child support obligation undermines that purpose.[47]  The superior court should first calculate the parents' child support obligation, then separately apportion the adoption subsidy between the parents.  This determination will typically be "consistent with their proportionate amount of time-sharing and not credited or offset against the child support award."[48]

The superior court correctly followed those steps here.  First, the court calculated Petersen's child support obligation:  $1,437.08 per month.  It then apportioned the adoption subsidies for three of the children, with half going to May and half to Petersen, reflecting the 50/50 physical custody arrangement for these three children.  Because May was receiving the entire adoption subsidy payment, however, it temporarily reduced Petersen's child support obligation "as long as May . . . continues to receive the full subsidy payments."  This was not a true credit or offset, but simply an accounting mechanism.  Instead of Petersen sending May $1,437.08 for child support and May sending back $1,221 for Petersen's half of the subsidy payments, only one check changes hands each month.  This resolution was well within the superior court's discretion.

May argues that the entire subsidy payment should go to her, as the lower-income parent, to ensure sufficient funds are available to both parents to meet the children's needs.  But as she recognizes, an adoption subsidy is income to the child, not

---

[47]     *See Hamblen*, 54 P.3d at 375 (explaining that adoption subsidy "is but an addition to a parent's obligation of financial support" and that awarding credit would "eliminate the supplementary effect of the subsidy"); *In re Bolding-Roberts*, 113 P.3d at 1268 (reasoning that "the child would have enjoyed the benefit of both parents' incomes, as well as the subsidy" had parents not separated).

[48]     *Tluzek v. Tluzek*, 179 So. 3d 455, 457 (Fla. Dist. App. 2015); *see, e.g.*, *Hamblen*, 54 P.3d at 376 (instructing trial court to apportion 16.1% of adoption subsidy to parent with whom children spent 16.1% of year).

the parent.[49]  Apportionment of an adoption subsidy should therefore generally reflect the physical custody arrangement,[50] as it did in this case.

### D.  May's Other Arguments Are Not Persuasive.

May argues that the superior court erred in denying her motion to reopen evidence, in its categorization of certain post-separation earnings, and in failing to award spousal support, an above-guidelines child support award, or additional attorney's fees.  May also argues that the property distribution is not fair or equitable because the marital home was awarded to Petersen.  We affirm the decision of the superior court in all respects.

#### 1.  The superior court did not abuse its discretion in declining to reopen evidence.

May moved to reopen evidence in September 2022, after the trial had concluded and the parties had submitted written closing arguments.  She argued that she had discovered new evidence showing that a case, which Petersen testified at trial had not yet settled, had in fact settled prior to trial.  She contended that this information would affect the valuation of the law firm, as well as the court's evaluation of Petersen's credibility.  In response, Petersen explained the case had not settled at the time he and his valuation expert prepared trial exhibits, but that he had already accounted for the marital portion of this settlement in his exhibits and calculations.  The superior court denied the motion to reopen evidence.

We review the denial of a request to reopen evidence for abuse of discretion.[51]  The superior court enjoys "large discretion . . . in permitting a party to

---

[49]  *Martin*, 303 P.3d at 427.

[50]  *See Tluzek*, 179 So. 3d at 457 (affirming equal distribution of adoption subsidy "consistent with the parties' equal time-sharing of the children").

[51]  *Snider v. Snider*, 357 P.3d 1180, 1184 (Alaska 2015).

reopen [evidence] after it has rested."[52]  In deciding whether to reopen evidence, the court should consider the importance of the evidence, the diligence of the offering party, and the potential prejudice to the other party.[53]

May argues the superior court abused its discretion because her evidence about the timing of the settlement contradicts Petersen's testimony about a pending case depicted in one of his exhibits.  She claims that Petersen's valuation expert had treated another large settlement by a different client in the same case as an anomaly in estimating the firm's cash flows, but that her new evidence showed that a second client had also settled for a substantial sum.  She reasons that this settlement shows that Petersen's expert undervalued the law firm.

The court did not abuse its discretion because May's evidence would not have made a difference to the outcome of the valuation decision.[54]  Petersen's expert ultimately decided to value the law firm on the basis of its net assets and not its cash flow, so evidence of the additional settlement would not have influenced her valuation.  The court accepted this valuation.

May also suggests that her evidence about the second settlement would have affected the court's evaluation of Petersen's credibility, which in turn would have affected its decision to accept his estimates of the marital portion of work on each case.  But May does not show that her evidence would have altered the court's assessment of Petersen's credibility.  She cross-examined Petersen about his calculation of the marital portion of each case, and the superior court found Petersen's testimony credible.  The court noted that some cases "have since settled or closed and some remain open," which

---

[52]    *Miller v. State*, 462 P.2d 421, 428 (Alaska 1969) (quoting *Massey v. United States*, 358 F.2d 782, 786 (10th Cir. 1966)).

[53]    *Snider*, 357 P.3d at 1186.

[54]    *Cf. id.* (holding superior court abused its discretion where additional evidence "could [have made] a difference to the superior court's decision").

is consistent with Petersen's original testimony and exhibits and with May's evidence showing that one of these cases later settled. The superior court did not abuse its discretion in declining to reopen evidence to reconsider its evaluation of Petersen's credibility.

**2. The superior court did not err in its categorization of Petersen's post-separation earnings.**

May challenges the superior court's finding that distributions made by DLG to Petersen after separation were Petersen's separate property. In general, income earned after the date of the parties' separation is separate property.[55] But May argues that these distributions are not equivalent to post-separation income. She relies on *Fortson v. Fortson*, a case in which we concluded that a portion of a dermatologist's post-separation earnings were not income but "excess profits" from clinic activities other than her personal efforts, such as sales of specialty services and cosmetics, and thus were marital property.[56] May analogizes the circumstances of the dermatologist in *Fortson* to Petersen's situation, contending that some portion of the distributions from DLG were not attributable to his individual efforts.

The superior court did not err in concluding that Petersen's post-separation earnings were his separate property. These earnings are not comparable to the earnings at issue in *Fortson*. Petersen testified that he took a base distribution of $20,000 per month on top of his annual $80,000 salary, with the distribution effectively equivalent to an earned income.[57] Excess profits are those that remain after earnings on tangible assets and an owner's compensation for services are deducted from total earnings, with a reasonable salary allowance excluded from the definition of excess

---

[55] *See Schanck v. Schanck*, 717 P.2d 1, 3 (Alaska 1986).

[56] 131 P.3d 451, 455, 460 (Alaska 2006).

[57] Trimble testified that paying owners primarily through distributions is a common practice of professional firms for tax reasons.

profits.[58]  Trimble estimated that a reasonable annual wage for a professional like Petersen, based on the firm's net sales, would be $226,000.  Total compensation of $320,000 annually — an $80,000 salary and $240,000 in distributions — is somewhat higher than Trimble's estimate, but it was not clearly erroneous for the court to treat these distributions as earned income rather than excess profits.  As post-separation earned income, Petersen's distributions were properly excluded from the marital estate.

Petersen also took some distributions above his $20,000 monthly distribution.  He testified that he took larger distributions when a case settled.  For settlements in June and July, for which most of the work was done pre-separation, he split his distributions evenly with May.  For later settlements, for which most of the work was done post-separation, he estimated the proportion of the work on the case that was done pre-separation and split the distributions with May according to that proportion.  The court found that these estimates were reasonable and accurately reflected Petersen's post-separation work.  These distributions are directly attributable to settlements Petersen litigated and are thus not excess profits under *Fortson*.  The superior court did not err by categorizing them as separate property.

### 3.    The superior court did not plainly err in failing to award spousal support.

May argues the superior court erred in failing to award her long-term spousal support.  She did not request spousal support in either her trial brief or her written closing argument.  Her motion for reconsideration requested only reorientation support, not the long-term support she requests now.  May's counsel suggested at oral argument that her earlier request for interim spousal support should have put the superior court on notice that an award of post-divorce spousal support was necessary,

---

[58]    *See Moffitt v. Moffitt*, 813 P.2d 674, 676-77 & n.3 (Alaska 1991) (defining "excess earnings" for purposes of valuing goodwill); *Fortson*, 131 P.3d at 460 & n.23 (applying this definition when determining "excess profits").

but the two types of awards serve different purposes and a request for one cannot be construed as a request for the other.[59]

We review issues raised for the first time on appeal for plain error.[60] We have acknowledged that, although we generally prefer to address financial needs through property distribution, awards of spousal support may be "just and necessary" in some circumstances,[61] such as when there is insufficient property to provide for the parties' needs.[62]

While the significant disparity between the earning capacities of the parties and the relatively small marital estate here may well have justified an award of spousal support if May had requested one,[63] we cannot say the superior court plainly erred by failing to award spousal support in the absence of such a request. The superior court acknowledged Petersen's higher earning capacity and attempted to make up for that disparity by awarding May a larger share of the marital estate. It also acknowledged May's financial needs in establishing a new household and winding up her business and recognized that Petersen was "in a better position to pay off both marital and post-separation debt." However, it also noted that May is a well-educated professional who earns at least $120,000 annually.

May argues that, even if she did not raise the issue of long-term spousal support, her position as the "disadvantaged spouse" was clear at trial, making it "unjust

---

[59]     *See Johnson v. Johnson*, 836 P.2d 930, 934 (Alaska 1992) (explaining interim support functions in part to ensure "neither spouse is disadvantaged in presenting their claims").

[60]     *In re Hospitalization of Tonja P.*, 524 P.3d 795, 800 (Alaska 2023).

[61]     *Hanlon v. Hanlon*, 871 P.2d 229, 232-33 (Alaska 1994) (quoting AS 25.24.160(a)(2)).

[62]     *Dixon v. Dixon*, 747 P.2d 1169, 1173 (Alaska 1987).

[63]     *Cf. Broadribb v. Broadribb*, 956 P.2d 1222, 1226-27 (Alaska 1998) (concluding superior court did not abuse its discretion in awarding spousal support).

for the court not to award ongoing spousal support." But general evidence of disadvantage is not enough. A spouse seeking long-term support "must present specific evidence establishing the need for that support, and the [superior] court must enter specific findings regarding that spouse's financial needs and the court's reasons for determining that the award was just and necessary."[64] May's failure to clearly raise the issue prevented the superior court from making any of the findings that could have justified an award of spousal support. The court did not plainly err by failing to do so sua sponte.

### 4. The superior court did not abuse its discretion by declining to make an above-guidelines child support award.

May briefly contends that the superior court erred by failing to make an above-guidelines child support award. The court has "broad discretion in making child support determinations."[65] This latitude includes the discretion to make an additional award of child support "when the formula produces an award which substantially . . . falls short of the amount needed to provide for the child's reasonable needs" and applying the formula would produce manifest injustice.[66]

While the court has the discretion to award additional child support in certain circumstances, one spouse's high income above the threshold set in Civil Rule 90.3(c)(2) "generally does not result in additional support."[67] The court here concluded that a departure from the guidelines was not justified because "[b]oth parties earn high wages and are able to meet the needs of their children," the parents shared 50/50 physical custody of three of the children, and the property division showed that the

---

[64]     *Hockema v. Hockema*, 403 P.3d 1080, 1089 (Alaska 2017).

[65]     *Wells v. Barile*, 358 P.3d 583, 588 (Alaska 2015).

[66]     *Epperson v. Epperson*, 835 P.2d 451, 453 (Alaska 1992); *see also* Alaska R. Civ. P. 90.3(c)(2) (permitting court to make additional child support award "only if it is just and proper").

[67]     *Sherrill v. Sherrill*, 373 P.3d 486, 493 (Alaska 2016).

children were "well-provided for." These findings are not clearly erroneous, and the court's resulting decision not to make an above-guidelines child support award was not an abuse of discretion.

> **5.** **The superior court did not abuse its discretion by declining to award additional attorney's fees.**

May argues that the superior court erred by declining to award attorney's fees to her. The court found that May had incurred fees totaling $144,896.61, as well as approximately $24,500 in expert costs, while Petersen had incurred $57,265.95 in fees and expert costs of approximately $26,000. The court found that both parties had incurred substantial fees and that, in light of its prior award of $20,000 in interim fees to May and its 60/40 division of the marital estate, no additional award of fees was necessary. May argues that this decision was "arbitrary, capricious, and manifestly unreasonable" in light of Petersen's higher income.

"A trial court has broad discretion to award attorney's fees in a divorce action, and we will not overturn such an award unless it is arbitrary, capricious, or manifestly unreasonable."[68] The purpose of a fee award is to ensure "both spouses have the means to litigate on an equal footing."[69] Absent a disparity in finances, "it is ordinarily error to make any award of costs or fees."[70]

May argues that such a significant disparity is present here, pointing to Petersen's higher income. But we have previously clarified that the financial situations of the parties "includes more than simply earning power; the property division itself is relevant."[71] When a party receives a property settlement sufficient to cover attorney's

---

[68] *Miller v. Miller*, 105 P.3d 1136, 1144 (Alaska 2005).

[69] *Rosenblum v. Perales*, 303 P.3d 500, 508 (Alaska 2013).

[70] *Berry v. Berry*, 277 P.3d 771, 779 (Alaska 2012) (quoting *Edelman v. Edelman*, 61 P.3d 1, 5 (Alaska 2002)).

[71] *Tybus v. Holland*, 989 P.2d 1281, 1289 (Alaska 1999).

fees, that party "should expect to pay his or her own attorney's fees,"[72] even when doing so would require liquidating assets and the other spouse has a higher income.[73]  Here, the property division awarded May $222,296, which was sufficient to cover her incurred attorney's fees.  The superior court's finding that no additional fee award was necessary to ensure the parties could litigate on an equal footing was not arbitrary, capricious, or manifestly unreasonable.

### 6. The superior court did not abuse its discretion in adopting a 60/40 division of the marital estate.

Finally, May argues that the property distribution is not fair or equitable because the marital home was awarded to Petersen.  We see no abuse of discretion in the property division.

Although equitable division begins from a "starting presumption . . . that an equal division is the most equitable,"[74] the superior court concluded that a 60/40 division in May's favor was justified here in light of Petersen's higher earning capacity and additional expenses May would incur establishing a new household.[75]  It supported this division by making findings on each of the factors set out in AS 25.24.160(a)(4).[76] May does not dispute the court's factual findings on any of these factors, but argues that it abused its discretion in its ultimate property division by failing to award her the marital home.

---

[72]  *Id.*

[73]  *Stevens v. Stevens*, 265 P.3d 279, 290-91 (Alaska 2011).

[74]  *Dunmore v. Dunmore*, 420 P.3d 1187, 1193 (Alaska 2018).

[75]  *See Dundas v. Dundas*, 362 P.3d 468, 480 (Alaska 2015).  Both parties acknowledged an unequal division would be justified here, though they disagreed on the precise division; May argued for a 65/35 division in her favor, while Petersen proposed a 55/45 division in May's favor.

[76]  *See Downs v. Downs*, 440 P.3d 294, 298 (Alaska 2019) ("Where the trial court makes these threshold findings, we generally will not reevaluate the merits of the property division." (quoting *Cartee v. Cartee*, 239 P.3d 707, 713 (Alaska 2010))).

The court awarded the marital home to Petersen, expressing concern about May's ability to afford the roughly $5,600 monthly mortgage and utility payments. In order to achieve a 60/40 division, it awarded Petersen the bulk of the marital debts and ordered him to make a substantial equalization payment to May. May argues that she testified that she would qualify to refinance the mortgage and, if she did not, that her sister would co-sign for her. The court acknowledged May's testimony on this point, but did not find it credible in light of her other testimony about her inability to meet the costs of upkeep on other marital assets, as well as Petersen's testimony about her financial circumstances. Such a credibility evaluation is within the discretion of the superior court.[77]

## V.  CONCLUSION

The decision of the superior court is AFFIRMED.

---

[77]  *Vezey v. Green*, 171 P.3d 1125, 1128-29 (Alaska 2007).

CARNEY, Justice, dissenting.

I disagree with the court on "the primary issue on appeal": the valuation of Petersen's law firm.[1] I agree instead with Justice Rabinowitz's dissent in *Richmond v. Richmond*.[2] His reasoning remains as perceptive and correct as it was in 1989. Because I agree with him, I respectfully dissent. And because I cannot say it better than he did I rely on his analysis:[3]

> As the majority points out, this court held in *Rostel v. Rostel*[4] that a professional practice's goodwill is a divisible marital asset.[5] Although some courts have held to the contrary,[6] this view remains the majority view[7] and, in my opinion and that of several commentators,[8] the better view:
>
>> Including goodwill within the marital estate is consonant with the policies of equitable distribution. Goodwill represents the probability of future earnings based on circumstances created during the marriage. It reflects the value of a demonstrated capacity to draw business, *i.e.,* the individual has already built up a following. After divorce the professional practice will

---

[1]     Opinion at 6.

[2]     779 P.2d 1211, 1218 (Alaska 1989) (Rabinowitz, J., dissenting).

[3]     *Id*.

[4]     622 P.2d 429 (Alaska 1981).

[5]     *Id*. at 430-31.

[6]     *See, e.g.*, *Powell v. Powell*, 648 P.2d 218, 222-24 (Kan. 1982); *Nail v. Nail*, 486 S.W.2d 761, 763-64 (Tex. 1972); *Holbrook v. Holbrook*, 309 N.W.2d 343, 354-55 (Wis. Ct. App. 1981).

[7]     *In re Marriage of Kapusta*, 491 N.E.2d 48, 51 (Ill. App. Ct. 1986); *Prahinski v. Prahinski*, 540 A.2d 833, 842 (Md. Ct. Spec. App. 1988) (citations omitted).

[8]     *See, e.g.*, HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES §16.5 (2nd ed. 1987); LAWRENCE J. GOLDEN, THE EQUITABLE DISTRIBUTION OF PROPERTY § 6.21 (1983) (citations omitted).

continue to benefit from the goodwill generated while the parties were married. Much of the economic value of the practice produced during the marriage may be reflected in its goodwill. It would be inequitable to ignore the contribution of the other spouse to the development of that economic resource.

There is one crucial distinction between a professional practice, on the one hand, and the education, degree, and license which are its necessary predicates. The latter are intellectual accomplishments, personal achievements of the holder. The practice is a commercial enterprise, a business. It provides income upon which the family depends. Equitable distribution assumes marriage is a partnership, with both parties contributing to its economic well-being. If the financial foundation of that partnership, the source of income, is placed beyond the reach of one of the spouses, the theory loses its meaning.

If equitable distribution does not apply to a professional business, is there any reason to apply it to any business? Valuation problems are not confined to the professions (even assuming that *professions* can be defined with precision). If something is property it comes within the statute, whether it is difficult to value or not. It is contrary to the spirit and policy of the statute to say that because the value of the practice, possibly the most substantial asset of the marriage, cannot be measured with certainty it will be given no value at all. If equitable distribution is to have vitality then such items must be included within its scope.[9]

Like Justice Rabinowitz before me, I respectfully dissent.

---

**9**    LAWRENCE J. GOLDEN, THE EQUITABLE DISTRIBUTION OF PROPERTY § 6.21 (1983).